## STEWART *v.* ALLEN.

*(Circuit Court, W. D. Pennsylvania. September 12, 1891.)*

1. SPECIFIC PERFORMANCE—LACHES—SALE OF LAND.
 An agreement for the sale of a tract of coal provided that the offer should remain open for six months, and that the first payment should be made in 30 days after acceptance. On June 11, 1880, within the six months, the vendee gave notice of acceptance, and told the vendor that he would have the money ready, to which the latter replied that the coal would be his if he paid the money at the time agreed. On January 6, 1881, the vendee offered to pay the first installment, but the vendor refused to take it. On October 7, 1882, the vendee assigned his rights under the agreement, and the assignee made a formal tender of the entire purchase money, which was refused. The assignee then filed a bill for specific performance, but suffered 7½ years to elapse before he began to prepare his case for final decree. No explanation was given for the delay of the vendee or of the complainant. *Held*, that the bill should be dismissed on account of laches.

2. SAME—MUTUAL OBLIGATION.
 The agreement provided that the coal should be surveyed. *Held*, that this was a mutual obligation which either party could request the other to join in performing, and, upon failure of the latter to comply, the former would not be held to a strict compliance with the agreement.

3. SAME—TIME OF ESSENCE OF CONTRACT.
 Although time was not of the essence of the contract, yet the vendor will be released by the unexplained failure of the vendee to pay the purchase money within the time provided in the agreement.

In Equity.    Bill of Hugh T. Stewart against Addison Allen for specific performance for sale of land.    Dismissed.

*W. G. Guiler* and *J. M. Garrison*, for complainant.

*Edward Campbell* and *T. C. Lazear*, for defendant.

REED, J.    The bill prayed specific performance by the defendant of an agreement between him and one James A. Searight, subsequently assigned by Searight to the plaintiff, for the sale of a tract of coal, with mining rights and privileges, situate in Fayette county, Pa.    The agreement is dated December 12, 1879, and is in form a proposal to sell to Searight, his heirs and assigns, a tract of coal containing 190 acres, more or less, with certain mining rights and privileges.    It further provides:

"The coal aforesaid, with privilege, etc., is offered at the rate of thirty dollars for each and every acre of coal contained, therein, to be ascertained by survey, to be paid in three equal annual payments, the first payment whereof to be made within thirty days from the date of acceptance of this proposal, interest to be paid on all back payments.  In consideration for which, as well as the sum of one dollar to me in hand paid, the receipt whereof is hereby acknowledged, I hereby agree that this offer shall remain open for the period of six months from the date hereof, and that the said Searight, his heirs or assigns, shall have the exclusive right for said period to purchase said coal. * * * Full possession of said coal, with privileges, etc., to be given when this offer is accepted, and the first payment of purchase money is made."

It further provided that Allen should make a deed for the coal, etc., whenever he had obtained title from the vendor under whom he held by articles of agreement; and if Searight at that time still owed any purchase money it should be secured by bond and mortgage.    Upon June 11, 1880, within the six months provided by the agreement, Mr. Searight gave the defendant written notice that he elected to take the coal in accordance with the terms and provisions of the agreement above recited.    Upon October 7, 1882, Mr. Searight assigned all his rights under the agreement to the plaintiff.    While the agreement of December 12, 1879, was signed by both parties, yet it was but an offer to sell, binding only on the defendant.    When Mr. Searight accepted it within the six months, and gave the defendant notice of such acceptance, the contract became binding on both parties as an agreement for the sale and purchase of the coal.    *Frick's Appeal*, 101 Pa. St. 485; *Corson* v. *Mulvany*, 49 Pa. St. 88.    The mutual obligations and rights of the parties are to be treated, therefore, as though the agreement had in the first instance been binding on both parties.    The testimony is conflicting as to the subsequent actions of the parties.    The plaintiff waived an answer under oath, and the defendant accepted the waiver by filing an answer, which was not verified by affidavit.    The defendant, therefore, is not entitled to have the benefit of his answer as a denial of the plaintiff's case, unless the denial is contradicted by the testimony of two witnesses, or by one and corroborating circumstances.    *Patterson* v. *Gaines*, 6 How. 550.    The plaintiff, however, is put to the proof of the allegations of the bill, the answer being analogous to the general issue at law.    *Bank* v. *Geary*, 5 Pet. 99.    Applying these rules, I conclude that the facts as

shown by the testimony are as follows: The defendant held the land and coal described in the agreement with Searight under an article of agreement with the heirs of John Rotruck, deceased, dated February 28, 1878. By the latter agreement one-third of the purchase money, amounting to $3,490, was to remain unpaid until the death of the widow of John Rotruck, she to receive the interest on this amount during life. After her death, and payment of the balance of purchase money, the defendant was to receive a deed for the property. At the time the agreement was made with Searight the defendant had not obtained a deed for the property. He subsequently, in September or December, 1881, paid the balance of purchase money, and obtained his deed. At the time the Searight agreement was executed there was an uncertainty as to the exact number of acres in the tract of land, and that agreement provided that the acreage should be ascertained by survey, which was not done by either party to the agreement, nor was any demand made by either party upon the other for such a survey. In May, 1890, a survey made during the taking of testimony showed 187 acres 64 perches of both land and coal in the tract in dispute, all the land being underlaid with coal. The acceptance by Searight of the option was dated June 11, 1880, and the defendant testified without contradiction that Mr. Searight, when serving his notice of acceptance, told him he would have the purchase money ready at the time fixed by the agreement, and that the defendant said to him: "If you pay the money over at the date, of course agreeable to that article, the coal is yours," to which Searight replied that he should have it. By the terms of the agreement the first payment of purchase money was to be made within 30 days from the date of acceptance of the proposal, which would have been on or before July 11, 1880. Sometime in the fall of that year the defendant, in a conversation with a Mr. Piersoll, told him that Mr. Searight had sent him word that his money was ready, but in the same conversation said that Mr. Searight had not complied with his agreements, and he would not let Searight have the coal. This conversation was put in evidence by the plaintiff. Mr. Searight testifies to two conversations, in the months of September and October, 1880, with the defendant in Uniontown, in which the defendant said he did not want his money at that time. The defendant denies this, testifying that he did not meet Mr. Searight at any time or place, after the acceptance by the latter of his proposal, until he met him at his house, January 6, 1881. As the burden of proof is upon the plaintiff, he has failed to establish the fact that such conversations took place. Upon January 6, 1881, Mr. Searight, accompanied by his attorney, now dead, went to the defendant's house, taking with him in money $1,900, being one-third of the purchase money. There is a contradiction between the witnesses as to what took place, but a consideration of the whole testimony leads to the conclusion that Mr. Searight offered to pay to the defendant one-third of the balance, after deducting from the total purchase money which he was to pay the incumbrance created for the benefit of Mrs. Rotruck. That when this was refused he offered to pay one-third of the whole purchase money without

v.47ᶠ.no.6—26

deduction. That these amounts were based upon an estimate of 190 acres of coal, as nearly as can be ascertained from the figures given by Mr. Searight. That Mr. Searight had the money in a package in his hand, but did not count it out. That the defendant refused to accept either offer, stating as a reason that the time fixed for payment of the first installment by the agreement had passed. On October 7, 1882, the rights of Mr. Searight passed to the plaintiff by assignment; and on October 9, 1882, a formal tender of $6,300, being purchase money and interest, was made to the defendant by the plaintiff's attorney, but was refused by the defendant for the same reason, namely, that Mr. Searight had failed to comply with his agreement; and, in addition, he said, in answer to the demand for a deed made at the time of this tender, that he could not give a deed, as he had not yet received a deed for the property, and that he did not consider the Searight agreement binding upon him.

It was the duty of Mr. Searight, having given notice of his acceptance of the defendant's proposal, to pay one-third of the purchase money within 30 days after such acceptance. This the contract required, without any further action on the part of the vendor. There was not, as is usual in such agreements, any concurrent duty resting on the vendor to deliver a deed for the property at the time he received the first payment. It is conceded that the vendee did not pay or offer payment of the first installment of the purchase money within the time fixed, but that his offer of payment was nearly five months after the expiration of the time; and the defendant's counsel have contended that by this default the rights which the vendor could claim under the agreement were lost, and the vendee had the right to treat the agreement as canceled. On the other hand, it is claimed by counsel for the complainant that a preliminary duty rested upon the vendor to ascertain the exact acreage of the coal by survey, and until this was done the vendee could not know the amount of the purchase money, and hence could not be held to strict performance; and also that, at all events, time was not of the essence of the contract. Counsel have failed to find any authorities upon the question of the obligation to survey; but in my judgment it was, by the terms of the contract, a mutual obligation, and the vendee could have requested the vendor to join in the making of the survey, and, if the latter had refused to join, the vendee would not have been held to a strict compliance with the contract; but, as he did not make this request, it was his duty to offer payment based upon the number of acres mentioned in the agreement, namely, 190 acres, and his offer upon January 6, 1881, was based upon that acreage. Time was not made of the essence of the contract by the terms of the agreement between the parties, and a court of equity would not, by anything in the agreement, be prevented from decreeing relief to the complainant, if his conduct and that of the original vendee have been otherwise meritorious. "There is no doubt that time may be of the essence of the contract for the sale of property. It may be made so by the express stipulations of the parties, or it may arise by implication from the very nature of the property, or the avowed objects of

the seller or the purchaser; and even when time is not thus, either expressly or impliedly, of the essence of the contract, if the party seeking a specific performance has been guilty of gross laches, or has been inexcusably negligent in performing the contract on his part, or if there has been in the intermediate period a material change of circumstances, affecting the rights, interests, or obligations of the parties, in all such cases courts of equity will refuse to decree any specific performance, upon the plain ground that it would be inequitable and unjust. But, except under circumstances of this sort, or of an analogous nature, time is not treated by courts of equity as of the essence of the contract, and relief will be decreed to the party who seeks it, if he has not been grossly negligent, and comes within a reasonable time, although he has not complied with the strict terms of the contract. But in all such cases the court expects the party to make out a case free from all doubt, and to show that the relief which he asks is, under all the circumstances, equitable, and to account in a reasonable manner for his delay and apparent omission of his duty." *Taylor* v. *Longworth*, 14 Pet. 172. "Time is not generally deemed in equity to be of the essence of the contract unless the parties have expressly so treated it, or it necessarily follows from the nature and circumstances of the contract. It is true that courts of equity have regard to time, so far as it respects the good faith and diligence of the parties; but if circumstances of a reasonable nature have disabled the party from a strict compliance, or if he comes, *recenti facto*, to ask for a specific performance, the suit is treated with indulgence, and generally with favor by the court." 1 Story, Eq. Jur. § 776. "It is now held that time, although not ordinarily of the essence of a contract in equity, yet may be made so by clear manifestation of the intent of the parties in the contract itself, by subsequent notice from one party to the other, by laches in the party seeking to enforce it, or by change in the value of the land, or other circumstances which would make a decree for the specific performance inequitable." *Barnard* v. *Lee*, 97 Mass. 94. "Performance may, in a proper case, be decreed when the party has lost his remedy at law. But laches and negligence in the performance of contracts are not thereby to be countenanced or encouraged, and the party seeking performance must show that he has not been in fault, but has taken all proper steps towards a performance on his own part, and has been ready, desirous, and prompt to perform." *Rogers* v. *Saunders*, 16 Me. 92. He must show that he has been ready, desirous, prompt, and eager to perform. *Miller* v. *Henlan*, 51 Pa. St. 265. In the present case no explanation is made of the cause for delay of almost five months in the vendee's offer to make his first payment. Without any excuse he permitted the period to elapse in which he was to make the payment, and this in the face of the notice from the defendant, at the time the vendee accepted the defendant's proposal, that the latter would expect him to comply with the provision as to the time of payment, and his own promise to do so. Whether this notice from the defendant is sufficient to make time of the essence of the contract, as is said in *Barnard* v. *Lee, supra*, is not material here, but it is a fact that is entitled to weight in considering

the conduct of the vendee. A vendee cannot thus ignore the time fixed for performance by the contract, against the expressed desire of the vendor for prompt performance, upon the theory that time was not of the essence of his agreement, and hence he could offer to perform when it suited him to do so. In *Benedict* v. *Lynch*, 1 Johns. Ch. 370, Chancellor KENT said:

"It may be laid down as an acknowledged rule in equity that when the party who applied for a specific performance has omitted to execute his part of the contract by the time appointed for that purpose, without being able to assign any sufficient justification or excuse for his delay, and when there is nothing in the acts or conduct of the other party that amounts to an acquiescence in that delay, the court will not compel a specific performance. The rule appears to be founded in the soundest principles of policy and justice. Its tendency is to uphold good faith and punctuality in dealing. The notion that seems too much to prevail, that a party may be utterly regardless of his stipulated payments, and that a court of chancery will almost at any time relieve him from the penalty of his gross negligence, is very injurious to good morals, to a lively sense of obligation, to the sanctity of contracts, and to the character of this court. It would be against all my impressions of the principles of equity to help those who show no equitable title to relief."

Upon the ground of unexplained delay on the part of Mr. Searight in making the first payment the complainant is not entitled to the relief he seeks in this case. But there is further delay and laches on the part of Mr. Searight which is, in my judgment, fatal to the complainant's case. His interview with the defendant, in which he offered payment, which was refused because of his default, took place January 6, 1881. He knew, therefore, the position taken by the defendant, and should have moved promptly in his efforts to hold the defendant to the contract. But he does nothing further until October 7, 1882, more than two years after he should have made his first payment, more than one year after he should have made his second payment, and nearly three months after he should have made his last payment, when he assigned his right, title, and interest in the agreement to the complainant, to be prosecuted at the "cost and risk" of the latter. Upon October 9, 1882, a tender was made by the attorney for Mr. Stewart, the complainant, of the whole consideration to the defendant, and refused by him on the ground that Mr. Searight had not complied with his agreement, and it was no longer binding. Thus, for a year and nine months after the interview of January 6, 1881, the matter had been allowed to rest, and, so far as the defendant knew, the vendee acquiesced in the position taken at that meeting, that the agreement was no longer in force. Such a delay, unexplained, is a sufficient ground upon which to refuse specific performance. Wat. Spec. Perf. p. 668. But there was also a delay on the part of the complainant after the assignment to him by Searight. On October 21, 1882, the bill was filed in this case. The subpœna was served on the defendant November 14, 1882; and, no answer having been filed, the complainant was entitled to take the bill *pro confesso* after the first Monday of January, 1883, and it was so taken by an order entered in the clerk's office March 23, 1883. The com-

plainant was entitled to move for a decree at any time after 30 days from the entry of the order, but nothing further was done until August 29, 1883, when a master was appointed, to report the number of acres in the tract of coal, and by the order directed to give the defendant 10 days' notice before taking testimony. Nothing further was done until May 29, 1890, nearly seven years later, when notice of taking testimony was served upon the defendant, who, on June 10, 1890, presented his petition, asking that the order *pro confesso* be taken off, and he allowed to defend. Having shown that he was in no personal default, and had no knowledge of the condition of the case until the notice of May 29, 1890, was served, the court, being satisfied of this, (as well as that his original counsel was not aware of the entry of the *pro confesso* order, having been in bad health at that time, and dying shortly afterwards,) allowed the defendant to answer, and the case has since proceeded with the usual rapidity of equity cases. Over 7½ years were suffered to elapse by the complainant after filing his bill before he undertook to prepare his case for presentation to the court for a final decree, and no explanation has been made of this delay. "The doctrine is well settled that great delay of either party, unexplained, in performing the contract, or, when he claims specific performance, in filing his bill, or in prosecuting his suit after the bill is filed, constitutes such laches as to forbid the interference of a court of equity, and to amount to an abandonment of the contract on his part." Wat. Spec. Perf. p. 659. "It is now clearly established that the delay of either party in not performing its terms on his part, or in not prosecuting his right to the interference of the court by the filing of a bill, or, lastly, in not diligently prosecuting his suit when instituted, may constitute such laches as will disentitle him to the aid of the court, and so amount, for the purpose of specific performance, to an abandonment on his part of the contract." Fry, Spec. Perf. § 730. A court of equity will not lend its aid to enforce the specific performance of a contract if the party seeking the aid of the court has been guilty of great delay in performing it, or in filing his bill, or in prosecuting his suit after the bill is filed. *Alexander* v. *Hoffman*, 70 Ill. 114; *Moore* v. *Blake*, 1 Ball & B. 62. The complainant, by his unexplained delay in prosecuting his suit to final hearing and decree, has, in my judgment, been guilty of such laches as to bar relief, if he was otherwise entitled to it. The language of the opinion in the case of *Du Bois* v. *Baum*, 46 Pa. St. 537, may be well applied to this case, Justice STRONG saying:

"The initiative towards the consummation of the contract was for him to take, not for the vendor. It was at the option of the vendor to rest quietly, or to proceed to enforce compliance with the agreement. The vendee had no such option. Having but a mere agreement for the title, dependent upon his own action, it was his place to be vigilant and pressing. His right might be lost by laches; the vendor's could not. Yet with such obligations upon him, with such a necessity for prosecuting his claim to the land without unnecessary delay, he took no step to consummate the agreement until this ejectment was brought. * * * Had he been in lawful possession, there would have been some apology for the delay, and perhaps a sufficient apology.

His lawful possession would have been constant action under the contract, but, as has been seen, he had no such possession."

There have been three distinct periods in the history of this transaction, in each of which the laches of the vendee or the complainant has been such as to prevent relief by specific performance. Taken as a whole, the defense upon this ground is impregnable, and the bill should be dismissed. Let a decree be drawn accordingly.