CUTTEN v. WALLACE, Secretary of Agriculture, et al.*

No. 5467.

Circuit Court of Appeals, Seventh Circuit.

Nov. 25, 1935.

Orville J. Taylor, James J. Magner, and Francis X. Busch, all of Chicago, Ill., for petitioner.

Wendell Berge, of Washington, D. C., Leo F. Tierney, John Dickinson, Asst. Atty. Gen., and Hugh B. Cox, Kenneth L. Kimble, Sp. Attys., and Seth Thomas, Solicitor, Department of Agriculture, all of Washington, D. C., for respondents.

Before EVANS and SPARKS, Circuit Judges, and BALTZELL, District Judge.

EVANS, Circuit Judge.

This is a petition for review of the order of the commission (created under the Grain Futures Act [7 U.S.C.A. § 1 et seq.]) which directed that all con-

*Writ of certiorari granted 56 S. Ct. 596, 80 L. Ed. ——.

tract markets refuse all trading privileges thereon to Arthur W. Cutten of Chicago for a period of two years from March 1, 1935.

Formal complaint against Cutten. had been made April 9, 1934, wherein he was charged with various violations of the Act enacted September 21, 1922, commonly known as the Grain Futures Act. A hearing was had before a commission consisting of the Secretary of Agriculture, the Secretary of Commerce, and the Attorney General. Upon the testimony taken, the commission made findings of fact from which we quote the following:

"1. The Chicago Board of Trade was duly designated as a contract market under the Grain Futures Act on May 3, 1923, and it has been a contract market continuously since that date.

"2. During the years 1930 and 1931 respondent was, and now is, a member of the Chicago Board of Trade.

"3. From and after October 31, 1927, through and including the year 1931, members of contract markets were required by regulations made pursuant to the Grain Futures Act to report to the Grain Futures Administration their net position in futures owned or controlled by them, long or short, by grain and by future, when they had net open commitments in any one future equal to or in excess of 500,000 bushels of wheat, corn or oats, and 200,000 bushels of rye or barley.

"4. Respondent in 1930 and 1931 had knowledge of the reporting requirements.

"5. Respondent, in 1930 and 1931, transacted his business through eight commission firms. He split his trade into 35 accounts. He carried some of his accounts in the names of relatives and associates. Respondent owned or controlled each of the 35 accounts.

"6. During the year 1930, respondent did not make any reports to the Grain Futures Administration.

"7. On approximately 130 days during 1930, respondent had open commitments in a single wheat future in accounts owned and controlled by him equal to or in excess of 500,000 bushels.

"8. On approximately 119 days during 1930, respondent had trades in a single wheat future in accounts owned and controlled by him in which he had open commitments equal to or in excess of 500,000 bushels.

"9. During the year 1931, respondent made reports irregularly to the Grain Futures Administration, none of which was true or correct as a statement of his net position on the market on the day covered by such report.

"10. During the year 1931, there were a great many days on which respondent made no reports at all, although having on such days open commitments in a single wheat future, in accounts owned and controlled by him, equal to or in excess of 500,000 bushels.

"11. On approximately 110 days during 1931, respondent had trades in a single wheat future in accounts owned and controlled by him, in which he had open commitments equal to or in excess of 500,000 bushels.

"12. On many days during the years 1930 and 1931, the respondent, in accounts definitely identified as belonging to him, had open commitments and trades which he failed to report as required by the Act and regulations made pursuant thereto.

"13. During the year 1931, the respondent made false reports of his open commitments and transactions in accounts definitely identified as his and indisputably belonging to him contrary to the Act and regulations made pursuant thereto.

"14. Respondent's purpose in concealing his position in the market was to manipulate the price of grain and thereby to make large profits. He systematically allocated purchases and sales of wheat futures to the various accounts in order to keep them under 500,000 bushels, and thus to avoid detection. He attempted to manipulate the price of grain."

The commission also made conclusions wherein it found that Cutten's conduct constituted a violation of the Grain Futures Act and the rules and regulations made pursuant thereto, and that an order should be entered that all contract markets refuse all trading privileges to him for a period of two years. The order, which is here assailed, was thereupon entered.

The Grain Futures Act has been upheld and construed in the following decisions: Board of Trade of Chicago v. Olsen, 262 U.S. 1, 43 S.Ct. 470, 67 L. Ed. 839; Board of Trade of Chicago v. Wallace (C.C.A.) 67 F.(2d) 402, and Bartlett Frazier Co. v. Hyde (C.C.A.) 65 F.(2d) 350.

The commission filed an opinion which dealt at length with the various questions raised by petitioner, which we will consider under two headings: (a) The sufficiency of the evidence to support the findings. (b) The sufficiency of the findings to support the order.

(a) Petitioner asserts that the evidence does not support the findings of the commissioners. With this contention, we cannot agree. It would serve no useful purpose to set forth the testimony upon which this conclusion is predicated. It is sufficient to say that the evidence amply supports the findings. It points persuasively to the conclusion that Cutten repeatedly, knowingly, and intentionally, during the deep depression years of 1930 and 1931, when agriculture was waging its losing battle for existence on account of low and ever lower prices, violated and flouted that provision of the rules and regulations promulgated pursuant to the authority of the statute which required him as a dealer to report the fact that he was short more than 500,000 bushels in any one future.

(b) Whether the findings support the order depends upon the construction which we are required to give to section 6 (b) of the act (7 U.S.C.A. § 9). The pertinent statutes read as follows:

"Sec. 5. The Secretary of Agriculture is hereby authorized and directed to designate any board of trade as a 'contract market' when, and only when, such board of trade complies with and carries out the following conditions and requirements: * * *" 7 U.S.C.A. § 7.

"Sec. 6. Any board of trade desiring to be designated a 'contract market' shall make application to the Secretary of Agriculture for such designation and accompany the same with a showing that it complies with the above conditions, and with a sufficient assurance that it will continue to comply with the above requirements.

"(a) A commission composed of the Secretary of Agriculture, the Secretary of Commerce, and the Attorney General is authorized to suspend for a period not to exceed six months or to revoke the designation of any board of trade as a 'contract market' upon a showing that such board of trade *has failed or is failing* to comply with any of the above requirements or is not enforcing its rules of government made a condition of its designation as set forth in section 5 [section 7 of this chapter]. * * *" 7 U.S.C.A. § 8.

"(b) If the Secretary of Agriculture has reason to believe that any person *is violating* any of the provisions of this Act [chapter], or *is attempting to manipulate* the market price of any grain in violation of the provisions of section 5 hereof [section 7 of this chapter], or of any of the rules or regulations made pursuant to its requirements, he may serve upon such person a complaint stating his charge in that respect. * * * Upon evidence received the said commission may require all contract markets to refuse such person all trading privileges thereon for such period as may be specified in said order." 7 U.S.C.A. § 9.

Petitioner argues that the power to suspend a trader must be found in section 6 (b) (7 U.S.C.A. § 9), and an examination of said section makes it imperative that the trader accused of the wrongdoing condemned by the Act be one who "*is* violating any of the provisions of this Act [chapter], or *is attempting to manipulate* the market price of any grain." In other words, petitioner contends that any violation of the Grain Futures Act of which he *was* shown to have been guilty *was committed* some two years *prior* to the institution of these proceedings, and consequently he is not within the purview of said section 6.

The determination of the appeal, therefore, turns upon the use of the words "is violating" and "is attempting to manipulate" in said section.

Respondents argue that although the statute uses the present tense, it should be so construed as to include past transactions. A rather strong and persuasive argument is made in favor of the wisdom of such a construction without which the power to deal with an offender is almost nil. We are, however, required to construe the statute,—not to pass upon its purposes, but upon its wording.

Support for limiting the construction of the words so as to exclude instances where the violation has occurred may be found in section 6 (a) (7 U.S.C.A. § 8). There, referring to the failure of the board of trade to comply with the requirements of the Act, we find the words "has failed or is failing" to comply with "any of the above requirements." What effect then must we give to the language of section 6

(b) where the words "has failed" are omitted?

It is admittedly rather difficult to understand why Congress would, when dealing with the punishment of a Board, include past as well as present violations, whereas in section 6 (b) when dealing with the punishment of the individual trader, it provides for punishment only when such person "is violating" or "is attempting to manipulate the market."

Respondents' counsel, in addition to supporting their argument that the Act, to effectually accomplish its purpose, should be made to cover past offenses as well as existing violations of the Act, call our attention to the following decisions: Church of the Holy Trinity v. United States, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226; United States v. Lacher, 134 U.S. 624, 10 S.Ct. 625, 33 L.Ed. 1080; The Sterling (C.C.A.) 65 F.(2d) 439; Silver v. Ladd, 7 Wall. 219, 19 L.Ed. 138; United States v. Kirby, 7 Wall. 482, 19 L.Ed. 278; Reiche v. Smythe, 13 Wall. 162, 20 L.Ed. 566; United States v. Katz, 271 U.S. 354, 46 S. Ct. 513, 70 L.Ed. 986; Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413, 86 A.L.R. 249; Helvering v. Stockholms Enskilda Bank, 293 U.S. 84, 55 S.Ct. 50, 79 L.Ed. 211; Huidekoper's Lessee v. Douglass, 3 Cranch, 1, 2 L. Ed. 347; Hayden v. Ortkeiss' Adm'r, 83 Ky. 396; Louisville Southern Railroad Company's Receivers v. Lewis, 101 Ky.

296, 41 S.W. 3; Malloy v. Chicago & N. W. Ry. Co., 109 Wis. 29, 85 N.W. 130; Rutherford v. Greene's Heirs, 2 Wheat. 196, 4 L.Ed. 218; Maysville & Lexington R. Co. v. Herrick, 13 Bush (76 Ky.) 122. These decisions are to the effect that a court is justified in departing from the plain language of the statute in order to give it a fair and practical meaning. Among the cases cited are some where the tense of the verb used in the statute is changed.

We are not, however, persuaded that the words of the statute here used can or should be so stretched as to include past violations which were committed and completed two years before the complaint was filed.[1]

We can not ignore the fact that Congress in dealing with contract markets provided for cancellation of rights if violations of regulations *had* occurred whereas in the next section the right to cancel a member's privilege on a contract market was limited to instances where the member *is* violating a regulation. While respondents' counsel has ably argued that the commission should have the power to suspend for past transgressions and without such authority the section is sterile—yet they have not met the stubborn and inescapable fact that Congress has spoken in two successive sections. In one it expressly included past as well as present violations and in the next section specified only existing viola-

[1] Where there is no ambiguity in words of statute there is no room for statutory construction. United States v. Missouri Pac. R. Co., 278 U.S. 269, 49 S.Ct. 133, 73 L.Ed. 322; Helvering v. New York Trust Co., 292 U.S. 455, 54 S.Ct. 806, 78 L.Ed. 1361; Michigan v. Michigan Trust Co., 286 U.S. 334, 52 S.Ct. 512, 76 L.Ed. 1136; Yerke v. United States, 173 U.S. 439, 19 S.Ct. 441, 43 L.Ed. 760; Texas v. Chiles, 21 Wall. 488, 22 L.Ed. 650; United States v. Wiltberger, 5 Wheat. 76, 5 L.Ed. 37; Boudinot v. United States, 11 Wall. 616, 20 L.Ed. 227; United States v. Union Pac. R. Co., 91 U.S. 72, 23 L. Ed. 224; Lewis v. United States, 92 U. S. 618, 23 L.Ed. 513; Doe v. Considine, 6 Wall. 458, 18 L.Ed. 869; United States v. Ewing, 184 U.S. 140, 22 S.Ct. 480, 46 L.Ed. 471; American Exp. Co. v. United States, 212 U.S. 522, 29 S.Ct. 315, 53 L.Ed. 635; Caminetti v. United States, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442, L.R.A. 1917F, 502, Ann.Cas. 1917B, 1168; United States v. Hill, 248 U.S. 420, 39 S.Ct. 143, 63 L.Ed. 337; United States v. Standard Brewery Co., 251 U.S. 210, 40 S.Ct. 139, 64 L.Ed. 229; Commissioner v. Gottlieb, 265 U.S. 310, 44 S.Ct. 528, 68 L.Ed. 1031; St. Paul, M. & M. R. Co. v. Phelps, 137 U.S. 528, 11 S.Ct. 168, 34 L. Ed. 767; Cox v. Lott, 12 Wall. 204, 20 L.Ed. 370; Russell Motor Co. v. United States, 261 U.S. 514, 43 S.Ct. 428, 67 L. Ed. 778; Duke Power Co. v. Commissioner (C.C.A.) 44 F.(2d) 543; Braffith v. People of Virgin Islands (C.C.A.) 26 F.(2d) 646; Riverdale Co-op. Ass'n v. Commissioner (C.C.A.) 48 F.(2d) 711; South Carolina Produce Ass'n v. Commissioner (C.C.A.) 50 F.(2d) 742; Town of Clayton v. Colorado & S. R. Co. (C.C.A.) 51 F.(2d) 977, 82 A.L.R. 417; Darby-Lynde Co. v. Alexander (C.C.A.) 51 F. (2d) 56; In re Boggs-Rice Co. (C.C.A.) 66 F.(2d) 855; McCaughn v. American Meter Co. (C.C.A.) 67 F.(2d) 148; United Electric Coal Companies v. Rice et al., 80 F.(2d) 1, decided by this court October 26, 1935.

tions as ground of suspension. To extend the latter section to the breadth of the former would be usurping 'the function of Congress.

Under such conditions it is for Congress to amend its legislation, if it deems it wise and desirable so to do, not for courts to do so by judicial construction.

The order is reversed.