## SECURITIES AND EXCHANGE COMMISSION v. TORR et al.

### No. 161.

Circuit Court of Appeals, Second Circuit.

Jan. 18, 1937.

John J. Burns, of Washington, D. C., and William V. Holohan, of New York City (Francis Thornton Greene, of Washington, D. C., of counsel), for respondent.

Gleason, McLanahan, Merritt & Ingraham, of New York City (Walter Gordon Merritt, Robert L. Reed, and Raymond L. Wise, all of New York City, of counsel), for appellants John M. Torr, Randolph P. Mills, and Ellery W. Mann.

Raymond L. Wise, of New York City, for other appellants.

Before MANTON, L. HAND, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

This suit was brought by the Securities and Exchange Commission under the authority of section 20 (b) of the Securities Act of 1933, 48 Stat. 74, as amended (15 U.S.C.A. § 77t (b) and section 21 (e) of the Securities Exchange Act of 1934, 48 Stat. 881 (15 U.S.C.A. § 78u (e). Its object is to restrain by preliminary and permanent injunction certain alleged violations of sec-

tion 17 of the Securities Act of 1933 (15 U.S.C.A. § 77q) and of section 9 of the Securities Exchange Act of 1934 (15 U.S. C.A. § 78i). The order from which the appeal was taken granted a preliminary injunction only against violation of section 17 (a) of the 1933 Act (15 U.S.C.A. § 77q (a) and of section 9 (a) (2) of the 1934 Act (15 U.S.C.A. § 78i (a) (2).

The motion for the preliminary injunction was granted on bill and supporting affidavits, some of the allegations of which were denied in the answers and counter affidavits, but the alleged facts so controverted were below, and may now be, disregarded in stating the factual situation on which the injunction granted was based. All else aside, the parties are in substantial agreement that:

The appellant, Ellery W. Mann, on or about October 24, 1935, was the owner of 47,000 shares of the stock of the Trans-Lux Daylight Picture Screen Corporation on which he gave an option to appellant Torr & Co. at prices from $3 to $4 per share. It was agreed that Torr & Co. would sell the stock, which was listed on the New York Curb Exchange, and that any net profits resulting would be divided between them in the proportion of two-thirds to Mann and one-third to Torr & Co. The option was filed with the New York Curb Exchange which was and is registered as a national securities exchange pursuant to section 6 of the Securities Exchange Act of 1934 (15 U.S.C.A. § 78f). Torr & Co. had no membership in any national securities exchange.

In order to bring about a demand for the stock in sufficient quantity and at profitable prices, Torr & Co. promptly made arrangements with various men in different states, who were familiar with the business of buying and selling securities and who had acquaintances and connections that enabled them to get in touch with probable buyers, to recommend the stock to such people and to the public generally as a good investment. They were not to, and did not in fact try to, sell the stock themselves nor through Torr & Co. necessarily, but were to recommend its purchase through such channels as the prospective buyers might prefer and were paid by Torr & Co. from $12.50 to $25 per hundred shares for all purchases of the stock on the New York Curb Exchange which they induced. These men did not disclose to those to whom they recommended the buying of the stock the fact that they were being paid for making such recommendation if purchases resulted and, indeed, it was necessary to the success of such a selling method for them not to make such disclosure but to appear to be disinterested. Aside from John M. Torr and Randolph P. Mills, who were the partners in the firm of Torr & Co., and Mann, the defendants are those who recommended the purchase of the stock for the secret commission above stated. What happened, and certain additional facts not disputed, has been correctly stated by the trial judge:

"The recommending defendants set about inducing purchases. Some of them worked in New York, others in Chicago, Philadelphia and San Francisco. There is nothing to indicate that any of them misrepresented any fact bearing on the intrinsic worth of the stock. For all that appears, the Trans-Lux Company is a sound one, and these defendants insist that they recommended the stock solely on its merit. But it is admitted that as a rule they did not disclose the fact that they were to be paid for each purchase brought about by their recommendation. One of them conceded, in the course of examination before an officer of the Commission, that such a disclosure would have injured the chances of success in producing purchases. Several of the recommending defendants were men with headquarters in the offices of securities dealers, but in business on their own account. One was a salaried 'customers' man in a stock exchange house in San Francisco. The principal defendants swear that they were unaware of the nature of his employment, that their instructions were that on no account was any 'customers' man to be subsidized for his recommendations.

"These activities produced purchases. The daily average of trading jumped from 400 shares to 2400 shares, the price rose from 3½ to 4⅜. Torr & Company sold some 16,000 shares between October 24 and December 10, 1935. They paid out substantial sums to compensate the recommending parties; how much is uncertain, as no records of payment were preserved. Much of the buying in the stock unquestionably came from members of the public who were not spoken to but were attracted by the increased activity on rising prices. The mails, as well as the telegraph and telephone between states, were made use of in promoting the distribution that has been described. The facilities of the Curb Exchange were likewise used. The quotation

tickers reporting transactions in stocks listed on the Curb Exchange are located in several states.

"The Commission makes no claim that the Trans-Lux Corporation is not a sound concern, or that the stock is not worth as much as was paid for it by those who bought. The contention is that the method of operation was one tending to defraud and mislead the public, first because of the failure of the recommending defendants to disclose their financial interest in the matter, second because the plan was one to create active trading in the stock so as to attract further purchases by others."

Additional alleged facts which have an important bearing on the issue of justification for the granting of a preliminary injunction in this case are that, before the defendants engaged in the enjoined practices, defendant Torr disclosed to the plaintiff what action was proposed and secured such approval as appears from the following partial quotation of the answering affidavit of Torr:

"On Monday morning, October 28, 1935 I telephoned Mr. William Nolan, a former partner of Bonner, Brooks & Company, whom I knew, and who as I understood held a very responsible position in the Interpretive Division of the Securities and Exchange Commission in New York City, and asked him over the telephone whether I could come over and see him on two matters which my firm was interested in and which I wished to discuss with him. I called Mr. Nolan from my office in the presence of my partner Mr. Mills. After I had identified myself, Mr. Nolan said, 'Yes, come right up to my office.'

"Immediately after talking to Mr. Nolan over the telephone, I went up to the New York offices of the Securities and Exchange Commission, 120 Broadway, and met Mr. Nolan. After a brief preliminary conversation I told him that my firm, Torr & Company, was interested in two situations, one with respect to Trans-Lux stock, which was listed on the New York Curb Exchange, and another with respect to the stock of Rustless Iron & Steel, which had been approved for listing and which I understood was before the Securities Exchange Commission in Washington for approval of registration. I told Mr. Nolan that I had come to him for advice as to how to proceed, inasmuch as I understood that the Securities and Exchange Commission maintained the Interpretive Division

for the purpose of giving guidance and counsel to brokers and other individuals with respect to market dealings. I then told him with reference to Trans-Lux that Torr & Company had a verbal option, which was to be reduced to a written agreement, on a block of Trans-Lux stock; that none of the officers or directors of the Trans-Lux Company had any interest in the stock, and that the stock was at present held by one of the New York banks. I told him that although Torr & Company was not a member of the New York Curb Exchange I intended nevertheless to file the option when received with that Exchange, but before doing anything about the matter I had come to him for advice as to certain procedural matters in order to be certain that our proposed plan of operation would in no way conflict with any of the Rules and Regulations of the Securities Exchange Acts. Mr. Nolan asked me how Torr & Company proposed to distribute the Trans-Lux stock. I told him that we intended to distribute it through dealers and by sales in the open market. I told him that I was particularly interested in ascertaining whether Torr & Company had the right to pay individuals commissions for the creation of buying orders in Trans-Lux stock which would aid in absorbing our offerings of the stock in the market. Mr. Nolan told me that we had a perfect right to pay such commissions, but that, of course, we could not make any payments to customers' men because that would be in violation of the Rules of the New York Stock Exchange. I told Mr. Nolan that we had no intention of paying commissions to customers' men.

"I also asked Mr. Nolan specifically whether Torr & Company had the right to purchase as well as sell Trans-Lux stock in the market. I stated that it was my impression, and I wanted to know whether I was correct, that we had the right to repurchase stock in the market but only so long as we purchased at prices lower than at which we sold—in other words, at a price which would show us a profit. Mr. Nolan told me that while there had been no definite decision covering a like situation, it was his understanding that repurchases could be made at a price not higher than that at which sales were made, without violating any of the provisions of the Securities Act, and particularly without violating the Sections of the 1934 Act having to do with market manipulation. I then asked him specifically, by way of example,

whether assuming we sold 100 shares of stock at $4.00 a share, at what price the stock could be repurchased and he replied, 'At·$4.00 a share or under.' He added that the Commission was not interested in whether we lost the broker's commission and taxes on the transaction but that the Commission would frown severely on any practice of buying up stock in the market above the price at which it was sold, which would have the effect of creating a higher market price. I said that I realized that such practices were forbidden."

It is not denied that Torr talked with Nolan at, or about, the time stated, but it is denied both that Nolan's duties covered the interpreting of the statutes and that their talk had to do with the stock of Trans-Lux Daylight Picture Screen Corporation. But it is uncontradicted that, after the plaintiff began its investigation which led to the bringing of this suit and the appellants were aware that their activities were considered to be in violation of some of the provisions of the above mentioned statutes, they stopped them and refrained from selling any of the optioned stock except that Torr & Co. continued to sell the remainder of what it had on the New York Curb Exchange. At the date of the hearing on the preliminary injunction all of this stock had been taken down.

The statutory basis for the motion for the preliminary injunction which was granted is found in language of which the following includes what is now pertinent: "Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this title [chapter], or of any rule of regulation thereunder, it may * * * bring an action * * * to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or· restraining order shall be granted without bond." Section 21 (e) of Securities Exchange Act of 1934 (15 U. S.C.A. § 78u (e). See, also, section 20 (b) of the Securities Act of 1933 (15 U.S.C.A. § 77t (b).

Assuming, arguendo, that the defendants were shown to have been violating valid statutes before the plaintiff undertook the investigation, we are confronted ·with evidence that such acts were committed only after steps had been taken which gave reasonable ground to believe that they did not ·run counter to the interpretation of the law by the plaintiff itself and with the fact that, when it appeared that plaintiff did not approve, the practices were discontinued before this suit was started. It must be recognized that these laws do materially alter the methods, hitherto lawful, which may be employed in security transactions, and the debatable nature of permissible conduct is apparent from a reading of the sections which are directly involved in this suit.

Section 17 (a) of the Securities Act of 1933 (15 U.S.C.A. § 77q (a) provides that: "It shall be unlawful for any person in the sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—(1) to employ any device, scheme, or artifice to defraud, or (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

And section 9 (a) (2) of the Securities Exchange Act of 1934 (15 U.S.C.A. § 78i (a) (2) provides that:

"Sec. 9 (a) It ˙shall be unlawful for any person, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange— * * *

"(2) To effect, alone or with one or more other persons, a series of transactions in any security registered on a national securities exchange creating actual or apparent active trading in such security or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others."

Ordinarily, it is no sufficient answer to a motion for an injunction that the improper conduct repeated in the past has been discontinued when action to impose legal restraint is known or thought to be in the offing, Goshen Mfg. Co. v. Hubert A. Myers Mfg. Co., 242 U.S. 202, 37 S.Ct. 105, 61 L.Ed. 248; Swift & Co. v. United States, 276 U.S. 311, 48 S.Ct. 311, 72 L.Ed. 587; Local 167, International Brotherhood of

Teamsters v. United States, 291 U.S. 293, 54 S.Ct. 396, 78 L.Ed. 804, for the likelihood of a resumption of the acts is a continuing menace. But, when such a likelihood does not in reason exist, justification for such drastic action as the issuance of a preliminary injunction is lacking, since there is in fact no lawful purpose to be served.

■ It cannot be justly thought that the accused practices were commenced in disregard of the statute. They were continued for only a little over a month and only while there is evidence that it was for good cause thought that they were not in violation of the law. Until the disputed facts can be tested by a trial, the only justifiable conclusion is that ·the appellants were making a genuine effort to conform to the law and that negatives an inference that violations, such as they were, had been due to more than mistaken interpretation or would be persisted in after they were called in question. So far as past conduct is concerned, there was, then, no sufficient ground for the preliminary injunction, since it would not support the inference of repetition in the future. Shore v. United States (C.C.A.) ·282 F. 857; Blease v. Safety Transit Co. (C.C.A.) 50 F.(2d) 852.

■ As the issuance of an injunction in cases of this nature has statutory sanction, it is of no moment that the plaintiff has failed to show threatened irreparable injury or the like, for it would be enough if the statutory conditions for injunctive relief were made to appear. Securities and Exchange Commission v. Jones (C.C.A.) 85 F. (2d) 17. But, when such statutory prerequisites are alone relied on, the unambiguous language of the statute is to be given its effect. Cutten v. Wallace (C.C.A.) 80 F.(2d) 140. That language in this instance conditions the right upon sufficient proof that "any person is engaged or about to engage in any acts, or practices which constitute or will constitute a violation" of the statute.

As the appellants were not engaging in any such acts or practices and the circumstances fail to support any reasonable inference that they were about to engage in any at the time the suit was brought or at the time the injunction was made effective, we are constrained to hold that it was improvidently granted. See Cutten v. Wallace, supra.

Reversed.

L. HAND, Circuit Judge (dissenting).

It seems to me that the facts are undisputed even as regards the probability of a repetition of the wrong. The affidavit of Holohan, who was conducting the proceedings for the plaintiff, alleged that the defendant, Mann, had told him that he might extend the option for distributing the shares and that if they were not restrained, the defendants would continue business by the same methods as before. I cannot find any contradiction of this in the affidavits. It is quite true that the unverified answer of Torr, Mills and Mann alleges that the shares have all been "taken down" and that they have "desisted and refrained" from selling except through the Curb Exchange. That did indeed raise an issue, but it is not evidence of which the defendants may avail themselves. Union Bank v. Geary, 5 Pet. 99, 112, 8 L.Ed. 60; Patterson v. Gaines, 6 How. 550, 588, 12 L.Ed. 553;· Stewart v. Allen (C.C.) 47 F. 399. These decisions arose under the old rules, it is true, but the new have introduced no change; without the sanction of an oath a party's pleading can be no more than a statement or forecast of his position. For these reasons I think that the plaintiff is entitled to an injunction pendente lite if the acts complained of were wrongs. On the merits I believe that they were and that substantially all the relief granted below was proper; but, as my views are not to prevail, it does not seem necessary to state them except upon the point on which our decision is to turn.