## SECURITIES AND EXCHANGE COMMISSION v. TORR et al.

District Court, S. D. New York.

March 4, 1938.

Allen E. Throop, of Washington, D. C. (William V. Holohan and John F. Davidson, both of New York City, and Samuel Harris, of Washington, D. C., of counsel), for plaintiff.

McLanahan, Merritt & Ingraham, of New York City (Robert L. Reed, of New York City, of counsel), for defendants John M. Torr, Randolph P. Mills and Ellery W. Mann.

Raymond L. Wise, of New York City, for defendants Geoffrey H. Bonnell, Irving Warshauer, Herbert E. Rau, Paul T. Collins, E. C. McIntyre, Richard S. Morris, and Leonard M. Collins.

WOOLSEY, District Judge.

I hold that the plaintiff is entitled to an injunction against the several defendants herein served on the grounds hereinafter indicated.

I. As a preliminary, before we get into a discussion of the questions of fact or of law involved herein, it is necessary to clear up the situation of the parties.

All the defendants above named, except "John" Leslie and Lewis Yedinsky, who were not served, have appeared in this action and are, therefore, defendants here.

The defendant Hurst and the defendant Gelderman have consented to injunctions, and I do not have to consider their case in any way.

In the case of the defendant Swords, before the trial was started, Mr. Wise made

an application to relieve himself of continuing to represent Swords, with whom he was unable to communicate and from whom he could not get any instructions. After hearing this motion and in pursuance of my powers as District Judge, I relieved Mr. Wise of further representing the defendant Swords; so this trial has been an inquest in equity as against him.

II. The facts are to a large extent common ground.

It appears that Ellery W. Mann, one of the defendants, was the beneficial owner of 10,000 shares of the common stock of Trans-Lux Daylight Picture Screen Corporation, hereinafter referred to throughout as "Trans-Lux," and with a number of other owners of the stock he eventually got together for distribution about 47,500 shares in all.

This stock so assembled was, as we have been told by Mann, the result of his having shaken out of Trans-Lux a large stockholder who was a very difficult person as a business mate. The 47,500 shares above mentioned represented only a part of the shares which this stockholder had owned.

In order to get this stock it had been necessary to borrow money.

The purchasers had paid $3 per share therefor, and the stock was being held by the Central Hanover Bank & Trust Company as security for a loan of $2 per share made to the purchasers. So far as the 47,500 shares were concerned, Mann had obligated himself for this loan.

The stock originally had been put into the hands of the bank in this way, as I recollect it, in February, 1935, and Mann first took up the question of distributing these shares of Trans-Lux some time in October with a Mr. McDermott, who was a stock broker, and a member of the Curb Exchange on which Trans-Lux was listed.

As a result of conversations, Mr. McDermott suggested that Torr & Co., a partnership consisting of the defendants Torr and Mills, dealers in unlisted securities, might be an excellent firm to assist in distributing this stock, and eventually an arrangement was made between Torr & Co. and Mann under which Torr & Co. agreed to act in the distribution thereof.

The arrangement, which took the form of an option or call to Torr & Co. for the stock, was substantially agreed on so far as prices were concerned some time at or about October 24, 1935, although the exact terms of the option were not reduced to writing until a few days later when a letter from the defendant Mann to Torr &.Co., antedated October 24, 1935, was written. The purpose of antedating the letter was to give Torr & Co. a 60-day option on the stock which would expire December 24, 1935.

This option read as follows:

> "Ellery W. Mann
> "155 East 44th Street
> "New York, N. Y.
> "October 24, 1935
>
> "Torr & Co.,
> "60 New Street,
> "New York N. Y.
> "Attention: Mr. J. M. Torr
> "Gentlemen: I am granting you options on 47,500 shares of the Trans-Lux Daylight Picture Screen Corporation for a period of sixty days, as follows:
>
> | 10,000 | shares | at | $3. |
> |--------|--------|-----|-------|
> | 21,500 | " | at | 3-1/2 |
> | 11,200 | " | at | 3-3/4 |
> | 5,000 | " | at | 4 |
>
> "The above stock will be made available to you at the main office of the Central Hanover Bank and Trust Company upon payments of the amounts indicated.
> "Yours very truly,
> "EWM:B    [Signed]   Ellery W. Mann."

It is here observable that the prices in the option went up—the first 10,000 shares were to be sold for $3 and the last 5,000 shares for $4. This indicated a hope at least, if not a purpose, that the market should also go up if it were possible to raise it. Otherwise there would be naught in it for Mann, Torr, and Mills. For this option was accompanied by an agreement between Torr & Co. and Mann, in which it was agreed that Mann should have two-thirds of the net profit from the sale of this stock on this distribution, and that the other one-third of the net profit should go to Torr & Co.

It was recognized, of course, that there would be expenses of distribution. These were to be deducted before the division of net profits referred to.

This arrangement, as I have frequently characterized it during the trial, constituted a joint venture between Mann, Torr, and Mills; the participants in the net profits.

Their objective necessarily was the distribution of the 47,500 shares of stock of Trans-Lux at a profit over the call prices.

It is a requirement of the New York Curb Exchange that all options shall be

filed with the Exchange, and, accordingly, Mr. McDermott, observing this rule, filed this option with the Exchange about the 30th of October, 1935.

In order to get rid of this option stock on the Curb Exchange, Torr & Co., acting for the joint venture, shortly after the option was agreed, made arrangements with the other named defendants, who were what have been referred to during the trial as "free lance brokers"—men not members of firms, who had acquaintances and connections with the securities business—that they should recommend the stock for investment to their acquaintances and generally as far as they could to the public.

Under these arrangements the free-lance defendants were to receive compensation or commissions ranging from $12.50 to $25 per hundred shares for all purchases of Trans-Lux on the New York Curb Exchange that could be attributed to them. There was no limit put on the amount of such purchases.

The defendants, other than Mann, Torr, and Mills, were situated in New York, Chicago, Philadelphia, and San Francisco, and afterwards one McIntyre went to Columbus, Ohio, so the foci for massaging the market were widely spread and advantageously located.

The purchases on the Curb Exchange which were induced by the recommendations of these men did not have to be, necessarily, purchases from Torr & Co. of the optioned stock, and the free-lance defendants were paid their commissions for any sales which fairly could be attributed to their influence, irrespective of who the seller might have been. In other words, the operation was aimed at the market rather than solely at the optioned stock.

One of the principal complaints of the Commission under section 17(a) of the Securities Act of 1933, 15 U.S.C.A. § 77q(a), is that these free lances failed in some instances expressly to disclose to those to whom they recommended the stock that they were to receive compensation on purchases resulting from their recommendations. I think it is fair to say that neither Torr, Mills, nor Mann failed to disclose to the persons to whom they spoke their interest in the stock, and I shall hereinafter deal with their responsibility under section 17(a) of the 1933 act on the basis of respondeat superior.

It is common·ground that the Trans-Lux Corporation was a sound, substantial, and successful organization. It is not claimed that the stock was not worth the prices paid for it, even at the highest point to which the market rose. It is not claimed that there was any misrepresentation whatever regarding the financial condition of Trans-Lux or the value of its shares, or that there was any attempt to have wash sales or matched orders on the stock.

The methods of the defendants were far more subtle.

That the defendants' efforts were successful is shown by the history of the operation.

In the two weeks prior to October 24, 1935, the average daily volume was 400 shares a day, and during this time the highest price at which the stock was sold was $3\frac{1}{2}$; the stock closing at $3\frac{1}{8}$ on October 23d.

In the two weeks subsequent to October 24, the average daily volume rose to 2,400 shares a day, and continued at this approximate average daily volume throughout the month of November, 1935.

On October 31st, the price of Trans-Lux stock ranged between $3\frac{5}{8}$ and $3\frac{1}{2}$, closing at the latter figure. The volume of transactions that day was 300 shares.

The following morning Torr & Co. wired the defendants Hurst and Collins in San Francisco confirming the arrangement made with them by the defendant Rau that they should secure purchases of Trans-Lux stock. Thereafter, on that day Hurst and Collins obtained and reported to Torr & Co. purchases totaling 1,500 shares; 1,100 shares at the price of $3\frac{5}{8}$ and 400 shares at $3\frac{3}{4}$.

The total volume on that day, November 1, 1935, was 3,200 shares; the stock ranging between $3\frac{1}{2}$, the opening price, and $3\frac{3}{4}$, the closing price. Torr & Co. themselves sold 800 shares at $3\frac{5}{8}$.

On November 8, 1935, as indicated in a telegram to the defendant Mann, who was then out of town, Torr & Co., through the activities of the other defendants, brought about purchases of 1,300 shares on the New York Curb Exchange, and themselves sold 500 shares.

The total volume on that day was 2,900 shares, the price ranging between $4\frac{1}{8}$ and $4\frac{1}{4}$, closing at the latter figure for the first time.

On November 12, 1935, Torr & Co. similarly brought about purchases of 1,800

shares of stock and themselves sold 900 shares; 500 at 4¼, and 400 at 4⅜.

On that day the total volume was 2,600 shares and the price reached 4⅜ for the first time.

The following day, November 13, 1935, when the total volume was 2,100 shares and the price ranged between 4⅜ and 4⅛, closing at 4¼, Torr & Co. was responsible for purchases of 1,600 shares, and themselves sold 100 shares.

On some days Torr & Co. sold no stock but made purchases at prices above the price at which optioned stock was available. For example, on November 21st, 300 shares were bought at 4⅛ and 100 at 4¼, and on November 22d, 1,000 shares at 4⅛. Optioned stock was then available at 3½.

Purchases of Torr & Co. totaled 3,200 shares up to the filing of the bill herein, and all of these purchases were at prices at or above the price at which optioned stock was then available.

The operation may be thus summarized:

From October 24th through December 23d, Torr & Co. sold altogether 18,400 shares of Trans-Lux stock.

These sales were all made on the New York Curb Exchange—except 1,000 shares which were sold over the counter to the firm of Hughes & Co.—at prices between 3½ and 4⅜, for a total consideration of $71,908.95.

The average sale price was approximately $4 a share, before deduction for brokers' commissions and stamp taxes.

Of the 18,400 shares so sold, 13,500 were shares that had been taken down under the option.

On December 24th, Torr & Co. sold 1,200 shares at 3¾.

Subsequent to December 23, 1935, and through March, 1936, Torr & Co. sold on the New York Curb Exchange approximately 25,500 shares. Of this amount, 23,562 constituted stock taken down under the option subsequent to December 23, 1935, and up to February 17, 1936.

Prior to December 23d, Torr & Co. purchased, as above noted, on the New York Curb Exchange a total of 3,200 shares, and subsequent to that date, they purchased 3,900 shares. During the entire distribution beginning October 24th, Torr & Co. sold 44,162 shares of which 37,062 were taken down under the option.

From October 24 through December 24, 1935, the total volume of transactions in Trans-Lux stock on the New York Curb Exchange was approximately 88,000 shares. During this time Torr & Co. paid out in cash as commissions to the free-lance broker defendants for obtaining purchases of the stock on the Exchange, approximately $11,000.

The evidence shows that these defendants were paid at the rate of $12.50 to $25 per hundred shares purchased on the New York Curb Exchange.

Assuming the payments averaged $20 per 100 shares, commissions were paid for purchases of over 50,000 shares of stock. This figure is consistent with the average percentage (63 per cent.) of transactions which Torr & Co. brought about on November 8, 12, and 13, 1935, as set forth in the telegrams to the defendant Mann.

In my opinion it is, therefore, clear beyond peradventure that the defendants in the operation described effected a series of transactions in Trans-Lux stock on the New York Curb Exchange which created active trading in Trans-Lux stock thereon for the purpose of inducing its purchase by others at prices higher than the option prices.

As the optioned stock had not all been disposed of during the period of the sixty-day call, an extension was necessary in order to complete the distribution. This extension was thus effectuated:

On or about December 24, 1935, when the original sixty-day call would end, there was an oral extension thereof to December 31, 1935.

On that date a written extension of the call was given to Torr & Co. by the defendant Mann in a letter which read as follows:

"Ellery W. Mann
"155 East 44th Street
"New York, N. Y.

"December 31, 1935

"Torr & Co.,
"60 New Street,
"New York, N. Y.

"Gentlemen: You are hereby advised that the option granted you on stock of the Trans-Lux Daylight Picture Screen Corporation under date of October 24, 1935, for a period of sixty days and thereafter extended until December 31, 1935 is now further extended up to and including February 29, 1936.

"It is understood that any stock you have already taken down against the option is no longer available, and that the 5,000 shares

of stock which was available to you at 3½ is now reduced to 3¼.

"Yours very truly,

"EWM:B    [Signed]    Ellery W. Mann"

"ACCEPTED

"[Signed]    'Torr & Co.'"

■ III. Now I turn to the statutes involved herein.

The Securities Act of 1933 provides under the heading of "Fraudulent Interstate Transactions":

Sec. 17. "(a) It shall be unlawful for any person in the sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

"(1) to employ any device, scheme, or artifice to defraud, or

"(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C.A. § 77q(a).

I hold that those defendants who recommended purchases of Trans-Lux stock without divulging that they were to receive commissions for such purchases as they secured were guilty of an unlawful practice under section 17(a) (2) of the Securities Act of 1933, 15 U.S.C.A. § 77q(a) (2). For when persons take the initiative in recommending a stock, as the free-lance brokers did in this case, they become what might be called volunteer fiduciaries; and if they do not tell the person to whom they make their recommendations that they are getting a commission therefor, they are guilty of a breach of duty to him because they omit to state a material fact necessary in order to make their recommendation not misleading in the light of the circumstances under which it is made.

I grant that this is a somewhat close question of the ethics of intercourse between man and man. But it seems to me that it is well over the line which divides the expectable candor of even a volunteer fiduciary from fraud and deceit; and while it does not involve the grosser type of fraud or deceit; I do think it is a subtle form thereof which in a case of this kind is seri-ous and material enough to bring the defendants within the prohibition of the above-mentioned section of the Securities Act of 1933.

Now, when the principals in this case set up the arrangement which I have described and got the free-lance brokers to go out and recommend purchases of Trans-Lux stock, they are liable as is any employer who engages somebody to do something for him, if that person in the course of his doing that thing for his employer commits a tort in order to promote his employer's objective. That has been repeatedly held, and I think that on this basis the defendants Mann, Torr, and Mills have brought themselves within the said prohibitions of said section of the Securities Act of 1933.

■ IV. I turn now to the Securities Exchange Act of 1934.

The section of that act with which we were really concerned at the trial is section 9(a) (2), 15 U.S.C.A. § 78i(a) (2), although I believe that section 9(a) (3) and section 9(a) (4), 15 U.S.C.A. § 78i(a) (3, 4), were also relied on, apparently by way of precaution, in the pleadings.

Section 9(a) (2) reads as follows (italics mine):

"(a) It shall be unlawful for any person, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange— * * *

"(2) To effect, alone or with one or more other persons, a series of transactions in any security registered on a national securities exchange *creating actual or apparent active trading* in such security or raising or depressing the price of such security, *for the purpose of inducing the purchase or sale of such security by others.*"

I do not think there can be any dispute about the fact—indeed, I suppose it is very trite to mention it—that the true value of a security is the price which it commands when it achieves its equilibrium in a free market. I think this is so obvious that all men can probably agree on it.

I understand that the object of section 9(a) (2) is to denounce and make unlawful the destruction of a free market in securities.

■ Now when the objective of such acts as were done here is to make a profit, you have already gone a long way towards

shewing a purpose to destroy such a free market.

What we really have here is a small pool managed by the defendant Mills. As the shares of Trans-Lux stock that were available on the market for sale were far greater in number than the shares of that stock in the option, a rise above the option price had somehow to be engineered in order that Mann, Torr, and Mills could make their desired profit. The only way to do this was by increasing the demand for the stock.

Of course, it is axiomatic that it is the ticker record of a stock that attracts customers, and here, by buying purchasing power and increasing activity, there was attention called to the stock and a marked advance was achieved by it.

It is extremely difficult to say that the massage of the market due to the activities of the defendants was the only reason why there was trading in Trans-Lux stock. All one can know is that the things above mentioned were done by these defendants, and that at once thereafter there was a noticeable increase in volume of trading in Trans-Lux stock and the rise in price expectable on such increased trading. These facts, coupled with the fact that the defendants Mann, Torr, and Mills planned to make a profit on their option in the stock, are enough for my purpose.

In deciding whether the defendants are guilty of any improper practice I think, as I stated during the trial, one might take, on the one hand, as an example of an obviously illegal pool, the Manhattan Electrical Supply Company pool, cf. United States v. Brown et al., D.C., 5 F.Supp. 81, and United States v. Brown et al., 87 F.(2d) 446 (C.C. A. 2), in which a worthless stock was involved and wherein wash sales were manipulated by one man, through ninety or more accounts—if I remember correctly— and there was bribery of customers' men ad libitum; and, on the other hand, as an example of a legal pool, the case reported in the footnote at page 90, of 5 F.Supp. of Sanderson and Levi v. The British Westralian Mines and Share Corporation, Ltd., where an English stock jobber agreed to buy at a named price all shares of a certain perfectly good stock which might be offered to him.

The first named case was held by me on demurrer to constitute a vicious manipulation, and the Circuit Court of Appeals upheld on appeal the conviction of the manipulators. The second case, however, was held by the British Court of Appeal not to be subject to criticism, and in that view I agree.

I should not have adverted to the subject of legal and illegal pools if I had not been reminded by defendants' counsel from time to time during the trial that in section 9(a) (6) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78i(a) (6), there is a provision for stabilizing the market in a security under rules to be enacted by the Securities and Exchange Commission, that the Commission has not enacted such rules, and that, therefore, it was arguable that the question as to what is and what is not a stabilizing operation is left more or less at large.

It does not seem to me, however,—and I have given much thought to this matter both during the fortnight whilst we were trying this cause, and since,—that it can properly be said that what was done here by the defendants was really a stabilizing operation.

I have always felt that to create an artificial market which appears to be real is something that is most unfair to the public because, even if a man purchases stock and makes a profit, he may be forced to purchase the stock at a higher price than he could have got it for in the absence of the stimulus which caused the artificial market. In this case I think for two reasons the operation herein cannot be considered to be a stabilizing operation, and, therefore, that it must come within the prohibition of section 9(a) (2).

Those two reasons are that the objective of the joint venture of the defendants was profit and that profit was only to be achieved by selling the stock at a price higher than what had been paid for it on the call in which increased prices were fixed for successive blocks of stock.

The method pursued by the defendants in their joint venture is, I find, exactly described in section 9(a) (2), which obviously would not be a method which would be approved by the Commission under its power to fix rules for stabilization given to it by section 9(a) (6).

I think, therefore, there is not any question but that all the defendants were guilty of unlawful acts under the provisions of section 9(a) (2) of the Security Exchange Act of 1934.

V. The remedy to be granted must next be decided.

A. The law of the case, cf. United States v. Davis, D.C., 3 F.Supp. 97, 98, 99, has in this regard been fixed for me by the Circuit Court of Appeals on the defendants' appeal from the preliminary injunction granted by Judge Patterson herein, Securities and Exchange Commission v. Torr, D.C., 15 F. Supp. 315, 318, in which the Circuit Court of Appeals reversed the preliminary injunction that was granted and left the facts to be ventilated at a plenary trial.

The Circuit Court of Appeals in its decision, Securities and Exchange Commission v. Torr, 2 Cir., 87 F.2d 446, at page 450, said: "As the issuance of an injunction in cases of this nature has statutory sanction, it is of no moment that the plaintiff has failed to show threatened irreparable injury or the like, for it would be enough if the statutory conditions for injunctive relief were made to appear. Securities and Exchange Commission v. Jones (C.C.A.) 85 F.(2d) 17. But, when such statutory prerequisites are alone relied on, the unambiguous language of the statute is to be given its effect. Cutten v. Wallace (C.C. A.) 80 F.(2d) 140. That language in this instance conditions the right upon sufficient proof that 'any person is engaged or about to engage in any acts, or practices which constitute or will constitute a violation' of the statute."

So if the defendants were engaged in unlawful practices when the Commission began its suit the statutory injunction should issue.

■ B. The filed papers in this case and the equity docket in the clerk's office, of both of which I may and do take judicial notice, show that the bill of complaint herein was filed December 23, 1935, and that at once, on request of the plaintiffs, one original and five duplicate original subpoenas were issued, and delivered or sent to the proper marshals for service on the several defendants.

December 24th was Chistmas Eve and December 25th was Christmas Day.

On December 26, 1935, the defendants Torr, Paul F. Collins, Hurst, and Leonard M. Collins were each served with a subpoena.

On December 27, 1935, the defendants Mills, Bonnell, Warshauer, Rau, McIntyre, Morris, and Gelderman were each served with a subpoena.

On December 30, 1935, the defendant Swords was served with a subpoena.

On January 6, 1936, the defendants Torr, Mills, and Mann appeared in this cause and filed a notice of appearance, dated January 2, 1936. There is no record of service of a subpoena on the defendant Mann, but it is shown in the docket that he was served with an order to show cause for an injunction on December 27, 1935. The filing of his notice of appearance, however, makes further inquiry as to what was served on him and when service took place immaterial.

■ C. At the time of the trial I was under the impression that a suit in equity was commenced only when a subpoena was served on the defendant against whom personal jurisdiction was sought. Under settled authority, however, I find that whenever personal jurisdiction of a defendant is secured by service of a subpoena or by his appearance, the commencement of a suit in equity relates back to the time when the bill was filed and the subpoenas issued. Penn General Casualty Co. v. Pennsylvania, 294 U.S. 189, 196, 55 S.Ct. 386, 389, 79 L.Ed. 850; Farmers' Loan, etc., Co. v. Lake St. R. Co., 177 U.S. 51, 60, 20 S.Ct. 564, 44 L.Ed. 667; Armstrong Cork Co. v. Merchants' Refrigerating Co., 8 Cir., 184 F. 199, 205, 206; Humane Bit. Co. v. Barnet, C.C., 117 F. 316, 318; Flower v. MacGinniss, 2 Cir., 112 F. 377, 378; United States v. American Lumber Company, 9 Cir., 85 F. 827, 829 to 831; Hayden v. Bucklin, 9 Paige, N.Y., 512; Fitch v. Smith, 10 Paige, N.Y., 9; Pindell v. Maydwell, 7 B.Mon., Ky., 314. Compare, also, Waldo v. Wilson, 4 Cir., 231 F. 654, 657; Continental & Commercial Trust, etc., Bank v. North Platte Valley Irrigation Co., 8 Cir., 219 F. 438, 442; Mound City Co. v. Castleman, C.C.W.D.Mo., 177 F. 510, 513; Beardslee v. Ingraham, 183 N.Y. 411, 421, 422, 76 N.E. 476, 37 L.R.A., N.S., 1073.

The history of the doctrine is set forth most fully perhaps in the decision of the Circuit Court of Appeals for the Ninth Circuit in the case of United States v. American Lumber Company, 85 F. 827, 829 to 831.

I hold, therefore, that under the procedural circumstances here shewn this suit must be deemed to have been commenced on December 23, 1935.

■ D. As to the facts:

It will be remembered that on December 24, 1935, Mr. McIntyre telegraphed Mr. Torr, "Please wire twenty-five today. Answer letter. Shall I function."

On the same day Mr. Torr replied: "Funds mailed last night. Function. Will wire funds tonight day's business."

These two telegrams clearly indicate that the joint venturers were still carrying on the operation in Trans-Lux stock when the suit was commenced on December 23, 1935, by the Securities and Exchange Commission.

It will be remembered, also, that there was an oral extension given of the option from December 24, 1935—when the option dated October 24, 1935, expired—to December 31, 1935.

The commencement of the suit against the defendants on December 23, 1935, therefore, caught them whilst they were presently engaged in unlawful practices.

E. The New York Curb Exchange had been registered as a national securities exchange under the Securities Exchange Act of 1934, and the Trans-Lux stock listed on said Exchange had also been registered with the Commission.

The ticker service of the New York Curb Exchange reporting prices and transactions thereon extends into twelve states and the District of Columbia. Instruments of interstate commerce and communications were admittedly used during the operation in this stock. Therefore, the whole operation came within the jurisdiction of the Securities and Exchange Commission.

Accordingly, on or about December 6, 1935, the Securities and Exchange Commission began an investigation of Mann, Torr, Mills, and their associates, and of the operation in which, as above described, they were jointly engaged in regard to the market for Trans-Lux stock on the New York Curb Exchange.

This investigation continued up to the time when the bill of complaint was filed on December 23, 1935. From this investigation the defendants must have been aware that there was at least an implication that they were doing something in contravention of the Securities Act of 1933, and the Securities Exchange Act of 1934. The filing of the bill cannot, therefore, be considered in any sense a bolt from the blue.

The supposed intellectual alibi which the defendants give to explain their continuing this operation after the investigation began is, I think, without merit. It is mentioned hereafter as a note to this opinion.

As above noted, the option was continued to February 29, 1936, and, subsequently, the balance of the optioned stock was sold during January and February on a market which had generally somewhat revived, though in respect of the Trans-Lux stock it may perhaps have still been feeling the momentum given to it by the defendants' efforts to stimulate purchases. But certainly it is not proved that the objectionable practices in operation when the suit was commenced were or were intended to be continued.

F. The provisions of the Securities Act of 1933 and of the Securities Exchange Act of 1934 with regard to proceedings to secure injunctions are identic and are contained in section 20(b) of the first act, 48 Stat. 86, 15 U.S.C.A. § 77t(b), and section 21(e) of the second act, 48 Stat. 899, 15 U.S.C.A. § 78u(e), and read as follows (italics mine): "Whenever it shall appear to the Commission that any person *is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this title* [chapter], or of any rule or regulation thereunder, it may in its discretion bring an action in the proper district court of the United States, the district court of the United States for the District of Columbia, or the United States courts of any Territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond. The Commission may transmit such evidence as may be available concerning such acts or practices to the Attorney General, who may, in his discretion, institute the necessary criminal proceedings under this title [chapter]."

There was much talk at the argument about the time from which an equity decree should speak. In this case, as I have found that there was something going on at the time this suit was commenced which could fairly be considered as a part of an illegal operation, the plaintiff has shown itself entitled to an injunction. For the facts shown before me on the trial I think were substantially changed from the facts which were before the Circuit Court of Appeals on the affidavits involved on the appeal from the preliminary injunction, and, consequently, I am not bound by its decision thereon.

G. Of course, in a case like this, when one has a number of defendants to deal with, one has to be selective in one's approach to them.

I make the following findings about the defendants now before me:

Leonard M. Collins of San Francisco recommended the stock without disclosing his interest to other customers. He himself was a customers' man of a San Francisco brokerage house, although that fact was not, as I understand it, known to Torr & Co. when arrangements were made with him through the defendant Rau.

Enloe Hurst did not divulge the fact that he was going to get commissions on the stock when he recommended it to purchasers.

Warshauer, one of the New York defendants, admits that he did not mention the fact he was going to get commissions when he spoke to people to whom he recommended this stock, and he also admits that he offered to a Mr. Andrews, of Emanuel & Co., a share in his commissions. Whether or not he knew that Andrews was a customers' man does not clearly appear, and, if he did know it, it would be important only as emphasizing his anxiety to spread his gospel as widely as might be.

Bonnell was very frank in stating that he did not tell any one to whom he recommended the stock that he was getting commissions for recommending it, unless they asked him, and usually they did not ask him.

Paul Collins testified practically to the same effect, that he told some people and did not tell others, but that he only told them when he was asked.

Swords, against whom the inquest is being taken, did not divulge that he was to get commissions.

There are no proofs as to what the defendant McIntyre's approach to his customers was, and, consequently, he cannot be dealt with under section 17(a) of the Securities Act of 1933.

There is no evidence whatever in this regard as to the defendant Morris, and, therefore, he cannot be dealt with under section 17(a) of the Securities Act of 1933.

Consequently, I hold that the Commission may have an injunction against all the defendants under the Securities Exchange Act of 1934, § 9(a) (2), and against all the defendants, except McIntyre and Morris, under the Securities Act of 1933, § 17(a).

■ VI. This opinion may stand as the findings of fact and conclusions of law required under Equity Rule 70½, 28 U.S.C.A. following section 723, and I will sign an order so providing which must be embodied in the final decree. Hazeltine Corporation v. Radio Corporation, D.C., 52 F.2d 504, 512; Lewys v. O'Neill, D.C., 49 F.2d 603, 618; Briggs v. United States, 6 Cir., 45 F. 2d 479, 480; Stelos Company v. Hosiery Motor-Mend Corporation, D.C., 60 F.2d 1009, 1013; Id., 2 Cir., 72 F.2d 405; Id., 295 U.S. 237, 55 S.Ct. 746, 79 L.Ed. 1414; cf. El Sol, D. C., 45 F.2d 852, 856, 857; Southern Pac. Co. v. U. S., 2 Cir., 72 F.2d 212.

■ There will be no costs. Title 15, United States Code, §§ 77v and 78aa, 15 U.S.C.A. §§ 77v, 78aa.

The final decree may be settled, unless agreed, on three days' notice.[1]

■ VII. *Note*: There was a question raised on the appeal of the preliminary in-

[1] After the above decision was rendered and after an argument on the settlement of the form of injunction to be issued, there were two decrees entered on March 25, 1938.

One decree was entered as against the defendants McIntyre and Morris, which only contained an injunction against any further acts by them which would be breaches of section 9(a) 2 of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78i(a) (2), as to which only they were found guilty.

This decree was in exactly the same form so far as the injunction was concerned as paragraph 2 of the following decree which was entered against all the other defendants:

This cause came on to be heard at this term, and was argued by counsel, and thereupon, upon consideration thereof, it was ordered, adjudged, and decreed that the defendants John M. Torr and Ran-

dolph P. Mills, individually and as copartners doing business under the name and style of Torr & Co., Ellery W. Mann, Geoffrey H. Bonnell, Irving Warshauer, Herbert E. Rau, Paul T. Collins, Frank J. Swords, and Leonard M. Collins, and each of them, their officers, agents, servants, employees, successors, and assigns, and all persons acting by, through, or under them, and each and every one of them, be and they hereby are perpetually enjoined and restrained:

1. In connection with the sale, solicitation of an offer to buy, or any attempt or offer to dispose of any security, by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly, from recommending the purchase on a national securities exchange of any security without disclosing the facts with respect to any arrangement, agreement, or understanding, ex-

junction as to whether the defendant Torr had been advised by a representative named Nolan, in the New York office of the Commission, that what he contemplated doing was not within the prohibition of the Securities Act of 1933, or of the Securities Exchange Act of 1934.

It is perfectly obvious, of course, that Nolan could not have given Torr and his associates what might be called an indulgence to do something within the prohibitions of the acts, and so bind the Securities and Exchange Commission from proceeding under the acts if anything forbidden was done.

 It is clear that there was a conference between Torr and Nolan, but I am not able to go much further on the evidence before me than to say that the idea was somehow conveyed to Torr by Nolan that what he contemplated doing was not a breach of the law. The probability that something of the kind was said to Torr, either in connection with Trans-Lux or other stock in which he was interested, is, I think, somewhat confirmed by the fact that it was not until August, 1937, that the Commission passed a rule, called GB 2, forbidding distributors of stock from employing persons to solicit purchases as was here done.

That Torr had this impression, however, does not alter in any way the fact that what was done herein came directly under section 17(a) of the Securities Act of 1933, and section 9(a) (2) of the Securities Exchange Act of 1934.

I mention the Nolan-Torr incident because it seems to me that it may be considered a reason tending to indicate that the defendants may have acted in good faith and that they did not have any intention to continue any practices that were found to be illegal.

The disciplinary powers over brokers dealing in over-the-counter securities given to the Commission under the Securities Exchange Act of 1934 are very great, and, in view of my granting the injunction in this case it would be possible, as I understand it, for the Commission to take proceedings looking toward the revocation of the licenses from it under which Torr & Co., and, doubtless, some of the other defendants, are now operating.

This would interfere with their means of livelihood, and it seems to me such proceedings should not be brought against the defendants in a case of this kind, which, although it was certainly an offense under the statute and was to be reprobated, is not tinctured with the gross kind of fraud which we so often meet in causes of this kind, and which I had before me in the case of United States v. Brown et al., D.C., 5 F.Supp. 81.

I trust, therefore, that there will not be any disciplinary proceedings taken against the defendants, and that the injunction which I have granted herein against them will end this matter.

press or implied, for the payment of any consideration or remuneration because of the making of such recommendation or because of any such purchase resulting directly or indirectly from such recommendation, contrary to section 17(a) (2) of the Securities Act of 1933, 15 U.S.C.A. § 77q(a) (2).

2. From directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, effecting, alone or with one or more other persons, a series of transactions in any security registered on a national securities exchange creating actual or apparent active trading in such security or raising the price of such security, for the purpose of inducing the purchase of such security by others, contrary to section 9(a) (2) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78i(a) (2).

And it is further ordered that the opinion of the court dated the 4th day of March, 1938, stand as the findings of fact and conclusions of law required by Equity Rule 70½, 28 U.S.C.A. following section 723.