**SECURITIES & EXCHANGE COMMISSION**
**v. TORR et al.**

District Court, S. D. New York.
April 10, 1936.

John J. Burns, of Washington, D. C. (Francis Thornton Greene, William V. Holohan, and Francis Currie, all of Washington, D. C., of counsel), for plaintiff Securities & Exchange Commission.

Gleason, McLanahan, Merritt & Ingraham, of New York City (Scott McLanahan and Robert L. Reed, both of New York City, of counsel), for defendants John M. Torr, Randolph P. Mills, and Ellery W. Mann.

Raymond L. Wise, of New York City, for defendants Bonnell, War-Shauer, Rau, Paul T. Collins, Swords, McIntyre, Morris, Gelderman, Hurst, and Leonard M. Collins.

PATTERSON, District Judge.

The suit is one in equity, brought under the Securities Act of 1933 (48 Stat. 74), as amended (15 U.S.C.A. § 77a et seq.), and the Securities Exchange Act of 1934 (48 Stat. 881 [15 U.S.C.A. § 78a et seq.]). The Commission alleges that the defendants have violated both of these statutes and asks that certain of their activities be enjoined. The Commission has also applied for an injunction during the pendency of the suit, and it is that phase of the case that is now presented for decision.

Certain facts are disputed. On the papers submitted in support of the application and those in opposition, however, the facts mentioned below are not in serious dispute: The stock of the Translux Daylight Picture Screen Corporation is listed on the New York Curb Exchange and is one of the stocks registered with the Securities & Exchange Commission under the 1934 act. The Curb Exchange is registered as a "national securities exchange" under the 1934 act. The defendant Mann, having acquired 47,700 shares of Translux stock, granted an option on October 24, 1935, to the defendants Torr and Mills, partners in the securities business under the name of Torr & Co., covering the 47,700 shares at prices ranging from $3 to $4 a share; the net profits to be realized on distribution of the optioned shares to be divided, two-thirds to Mann and one-third to Torr & Co.

The market in Translux was quiet at the time. For some weeks the daily trading had averaged 400 shares, with prices between 3 and 3½. It was evident to those interested that if the optioned shares were to be disposed of at a profit, the price would have to go higher. And for the price to go higher, it was essential that there be an increased demand for the stock. To stimulate the necessary demand, Torr & Co. made arrangements with the other defendants, men with acquaintances and connections in the securities business, to recommend the stock for investment to their acquaintances and to the public generally. The recommending defendants were to receive compensation of from $12.50 to $25 per hundred shares for stock purchased by reason of their recommendation. Purchases so induced were to be made on the Curb Exchange through brokers of the purchasers' selection, not directly from Torr & Co. In fact, the compensation was payable whether or not the purchases were filled from Torr & Co.'s supply of the shares.

The recommending defendants set about inducing purchases. Some of them worked in New York; others in Chicago, Philadelphia, and San Francisco. There is noth-

ing to indicate that any of them misrepresented any fact bearing on the intrinsic worth of the stock. For all that appears, the Translux Company is a sound one, and these defendants insist that they recommended the stock solely on its merit. But it is admitted that as a rule they did not disclose the fact that they were to be paid for each purchase brought about by their recommendation. One of them conceded, in the course of examination before an officer of the Commission, that such a disclosure would have injured the chances of success in producing purchases. Several of the recommending defendants were men with headquarters in the offices of securities dealers, but in business on their own account. One was a salaried "customers' man" in a stock exchange house in San Francisco. The principal defendants swear that they were unaware of the nature of his employment; that their instructions were that on no account was any "customers' man" to be subsidized for his recommendations.

These activities produced purchases. The daily average of trading jumped from 400 shares to 2,400 shares; the price rose from 3½ to 4⅜. Torr & Co. sold some 16,000 shares between October 24 and December 10, 1935. They paid out substantial sums to compensate the recommending parties; how much is uncertain, as no records of payments were preserved. Much of the buying in the stock unquestionably came from members of the public who were not spoken to but were attracted by the increased activity on rising prices. The mails, as well as the telegraph and telephone between states, were made use of in promoting the distribution that has been described. The facilities of the Curb Exchange were likewise used. The quotation tickers reporting transactions in stocks listed on the Curb Exchange are located in several states.

The Commission makes no claim that the Translux Corporation is not a sound concern, or that the stock is not worth as much as was paid for it by those who bought. The contention is that the method of operation was one tending to defraud and mislead the public, first, because of the failure of the recommending defendants to disclose their financial interest in the matter; second, because the plan was one to create active trading in the stock so as to attract further purchases by others.

1. The Securities Act of 1933, by section 17 (a), 15 U.S.C.A. § 77q (a), provides: "It shall be unlawful for any person in the sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—(1) to employ any device, scheme, or artifice to defraud, or (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

That the defendants have been engaged in "the sale of" a security, and that means of interstate communication, as well as the mails, have been employed in aid of such sale, are facts too plain for discussion. And it is plain enough, I think, that the selling campaign also embodied a feature that operated as a deceit on purchasers. When a person gives advice to buy a stock under circumstances that lead the listener or reader to believe that the advice is disinterested, and suppresses the fact that for giving such advice he is in reality being paid by one anxious to sell the stock, the purchaser acting on the advice is imposed upon and deceived. United States v. Brown, 79 F.(2d) 321 (C.C.A.2). One who had bought property under such conditions would have the right to rescind the purchase, a right long recognized both at common law and in equity. The ground of rescission is that the purchase was brought about by the sharp practice of the seller or of his agent. In principle there is no difference between the method of recommendation pursued here and the hired employment of a tipster sheet that purports to give impartial information. In both cases there is an "omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

It is of no consequence that purchasers may have obtained full value for their money. Section 17 (a) of the 1933 act makes no mention of pecuniary loss to the public. Persons may be deceived and yet suffer no financial loss. We know that under

the act making it an offense to use the mails in a scheme to defraud (18 U.S.C.A. § 338), it is not an essential element of the offense that the victims should have incurred pecuniary loss. Linn v. United States, 234 F. 543 (C.C.A.7); Wine v. United States, 260 F. 911 (C.C.A.8); Cowl v. United States, 35 F.(2d) 794 (C.C.A.8). Similarly, we know that under the act denouncing a conspiracy to defraud the United States, the United States may be "defrauded" without suffering loss of money or property. Haas v. Henkel, 216 U.S. 462, 30 S.Ct. 249, 54 L.Ed. 569, 17 Ann. Cas. 1112.

There has been a violation of section 17 (a) of the 1933 act.

■ 2. The Securities Exchange Act of 1934, in section 9 (a), 15 U.S.C.A. § 78i (a), provides:

"It shall be unlawful for any person, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, * * *

"(2) To effect, alone or with one or more other persons, a series of transactions in any security registered on a national securities exchange creating actual or apparent active trading in such security or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others."

The words used by Congress in this subsection are criticized as too vague to be understood and as so broad as to render unlawful the ordinary conduct of a person desirous of selling securities owned by him. The meaning, however, is tolerably clear and the effect not as broad as claimed. Section 9 (48 Stat. 889 [15 U.S.C.A. § 78i]) bears the title "Prohibition against manipulation of security prices," and the various subdivisions of the section deal with manipulative practices deemed injurious to the free flow of securities in interstate commerce, such as washed sales, matched orders, circulation of reports of pools, and pegging of prices. Among the manipulating devices reported to the House of Representatives by the House Committee of Interstate and Foreign Commerce, in its report on this bill, was that of designed marking up of prices to make the public believe that there was an increasing demand for the stock and so to draw the public into the market. By the paragraph in question, section 9 (a) (2), Congress sought to put an end to trading in securities carried on, not for the ordinary purposes of sellers and buyers, but for the effect on future trading. The activity that is declared unlawful is the production of trading in a security by manipulative methods for the purpose of inducing the further purchase or sale of the security by the public.

■ The defendants' activities are in the forbidden field. They have been using means of interstate commerce, the mails, the facilities of the Curb Exchange, to sell the stock and to inspire buying in it. Their effort was not merely to sell at a profit the shares which the recommending agents were able to induce persons to buy; the effort was also to "broaden the market" generally, to draw in other persons who would be attracted by increased activity at rising prices, and thus to dispose of a large number of shares. That this has been the purpose is clear from the defendants' own admissions and from various incidents of the operation. Torr & Co., for example, did more than mere selling; they bought substantial blocks of stock on the market. Again, the commissions to the recommending defendants were payable whether or not the stock delivered to the induced purchasers was that held by Torr & Co.

There has been a violation of section 9 (a) (2) of the 1934 act.

■ 3. The defendants do not press the argument that section 17 (a) of the 1933 act is invalid on constitutional grounds. The constitutionality of that statute, so far as use of the mails is concerned, is settled for this court by Jones v. Securities and Exchange Commission, 79 F.(2d) 617, decided recently by the Circuit Court of Appeals of this circuit.[1] But an extended argument is made against the constitutionality of section 9 (a) of the 1934 act (15 U.S.C.A. § 78i (a).

■ Whatever the scope of other provisions of the 1934 act, section 9 (a), so far as it is involved in this case, is limited to transactions in registered securities that are carried on by use of, first, the mails; second, means of interstate commerce; or, third, facilities of national securities exchanges. The practices that are forbidden are those that Congress might reasonably

---

[1] The Jones Case was reversed on another ground by the Supreme Court on April 6, 1936. 298 U.S. 1, 56 S.Ct. 654, 80 L.Ed. ——.

find to be likely to lead to the deception of the public. With the mails under national control, Congress has the clear power to forbid the use of the mails for deceptive transactions. As for the mails, this section of the 1934 act is no broader in scope than the 1933 act held valid in Jones v. Securities and Exchange Commission, supra. The act making it an offense to use the mails in a scheme to defraud and the act excluding lotteries from the mails are familiar instances of the exercise of the power of the federal government over the postal system, not to mention many others. Ex parte Jackson, 96 U.S. 727, 24 L.Ed. 877; In re Rapier, 143 U.S. 110, 12 S.Ct. 374, 36 L.Ed. 93; Badders v. United States, 240 U.S. 391, 36 S.Ct. 367, 60 L.Ed. 706. The power of Congress over commerce among the states is likewise a power of broad extent. The power has been exercised, validly exercised, to close the channels of interstate commerce to lottery tickets, impure food, transportation of women for immoral purposes, stolen automobiles. Lottery Case, 188 U.S. 321, 23 S. Ct. 321, 47 L.Ed. 492; Hipolite Egg Co. v. United States, 220 U.S. 45, 31 S.Ct. 364, 55 L.Ed. 364; Hoke v. United States, 227 U.S. 308, 33 S.Ct. 281, 57 L.Ed. 523, 43 L.R.A.(N.S.) 906, Ann.Cas.1913E, 905; Brooks v. United States, 267 U.S. 432, 45 S.Ct. 345, 69 L.Ed. 699, 37 A.L.R. 1407. It cannot be doubted that Congress may close the channels of interstate commerce likewise to such transactions in corporate securities as it has reasonably found and declared to be directly detrimental to the financial health of the public generally. To be sure, there is a limit to the control of both the mails and interstate commerce. Congress may not use either of these powers in an arbitrary manner, as to take away a right guaranteed to citizens by other provisions of the Constitution or to seize control of a matter purely local in character. Adair v. United States, 208 U. S. 161, 28 S.Ct. 277, 52 L.Ed. 436, 13 Ann. Cas. 764; Hammer v. Dagenhart, 247 U. S. 251, 38 S.Ct. 529, 62 L.Ed. 1101, 3 A. L.R. 649, Ann.Cas.1918E, 724; Railroad Retirement Board v. Alton R. Co., 295 U. S. 330, 55 S.Ct. 758, 79 L.Ed. 1468. But this limit is not passed in the case of a statute that bars manipulative transactions in securities from the mails and from interstate commerce.

The third method of control exercised in this provision of the 1934 act is on transactions in securities effected by "any facility of any national securities exchange." Section 9 (a). Here the regulating right of Congress is not as obvious as with the mails and means of interstate commerce. A transaction on a securities exchange, viewed narrowly, is one carried on wholly within a state. We may take judicial notice of the fact that a transfer of securities on an exchange is contracted for on the spot by two brokers; one representing the seller, the other representing the buyer. It may be also that both seller and buyer reside in the state where the exchange is located, in which case the transaction from beginning to end is carried out within the borders of that state. But we have the express finding by Congress, in section 2 of the 1934 act (15 U.S.C.A. § 78b), that transactions in securities exchanges are carried on in large volume by the public generally and in large part originate in other states, that they constitute an important part of the current of interstate commerce, that such transactions are susceptible to manipulation and control, resulting in sudden and unreasonable fluctuations in prices and in great damage.[2]

In support of these findings Congress had before it voluminous reports of com-

---

[2] Other findings in section 2 of the 1934 act are that transactions in securities on securities exchanges involve in large part the securities of concerns engaged in interstate commerce, and involve the use of credit directly affecting the financing of trade, industry, and transportation in interstate commerce; that prices in such transactions are quoted throughout the country and form the basis for determining prices at which securities are bought and sold, the amount of taxes due the United States and states, and the value of collateral for bank loans; that manipulations in prices hinder proper appraisal of the value of securities and prevent proper calculation of taxes, thus affecting the taxing power and prevent fair valuations of collateral for bank loans, thus obstructing the national banking system and federal reserve system; that national emergencies producing widespread unemployment and dislocation of trade are precipitated and intensified by manipulations and speculations on securities exchanges, thus putting the federal government to great expense in meeting the emergencies. Whether these references to other national aspects of the matter in question would support the 1934 act is a point that need not be decided.

mittees that investigated practices in securities dealings.

██ Such findings, while not conclusive on the courts, are presumptively sound. They may be overthrown by contrary findings of greater weight, based on facts of common knowledge or on other facts judicially noticed, or on facts proved by the parties asserting invalidity of the statute; but until so overthrown the facts found by the Legislature are to be taken as true. In addition there is always the presumption that the underlying facts support the constitutionality of legislation. Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369, Ann.Cas.1912C, 160; Block v. Hirsh, 256 U.S. 135, 154, 41 S.Ct. 458, 65 L.Ed. 865, 16 A.L.R. 165; O'Gorman & Young v. Hartford Ins. Co., 282 U.S. 251, 257, 258, 51 S.Ct. 130, 75 L.Ed. 324, 72 A.L.R. 1163; Borden's Co. v. Baldwin, 293 U.S. 194, 209, 55 S.Ct. 187, 79 L.Ed. 281; 38 Harvard Law Review, page 6.

██ There being no facts here either of judicial notice or of proof by the defendants that contradict the legislative findings already referred to, those findings of underlying facts are to be taken as true. That is to say, it is to be taken as true, at least on this record, that transactions on securities exchanges in large part originate outside the states where the exchanges are situated and form an important part of interstate commerce, and that manipulative practices on exchanges directly affect the prices of such securities and impede the interstate current. With that premise the case falls within the rules of law laid down in Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229, and Board of Trade of City of Chicago v. Olsen, 262 U.S. 1, 43 S.Ct. 470, 67 L.Ed. 839. In the former case, the Packers and Stockyards Act of 1921 (7 U.S.C.A. § 181 et seq.), putting transactions of commission men and livestock dealers at the stockyards under federal control, was held valid. In the latter case, the Grain Futures Act of 1922 (7 U.S.C.A. § 1 et seq.), putting local dealings on boards of trade in grain for future delivery under federal supervision, was held valid. Both cases were decided on the ground that there was a great interstate commerce in the commodities concerned, and that Congress had the power to subject to regulation local incidents that directly affected such commerce. It follows that section 9 (a) of the act in question, in so far as it purports to prohibit manipulative transactions effected on national securities exchanges, is a valid exercise of federal control over interstate commerce.

██ A considerable part of the defendants' argument is directed against section 12 of the 1934 act (15 U.S.C.A. § 78l). That section requires registration by corporations whose securities are traded in on securities exchanges, and several following sections are devoted to regulatory measures that bear on such corporations and on persons financially interested in them. That section, the argument runs, is an intrusion into matters purely local in character and is invalid; and it is urged that section 9 (a) is so bound up with section 12 as to be dragged down with it. But the Translux Company has apparently complied with section 12 and is not urging invalidity of the section. The defendants are not of the class affected by section 12, and cannot be heard to assail its validity. Plymouth Coal Co. v. Pennsylvania, 232 U.S. 531, 34 S.Ct. 359, 58 L.Ed. 713; Blackmer v. United States, 284 U.S. 421, 442, 52 S.Ct. 252, 76 L.Ed. 375. The act carries a separability provision (section 33 [15 U.S.C.A. § 78gg]) to the effect that if any provision be held invalid, the remainder of the act shall not be affected. It would therefore be inappropriate in this case to discuss the validity of section 12.

██ 4. It is asserted in one of the answers that since the defendants have learned that the Commission took the view that their activities were in violation of the 1933 and 1934 acts, they have ceased all efforts to sell the stock except that they have continued through brokers to offer the unsold balance for sale on the Curb Exchange. The argument is made that there is therefore no need of an injunction; that the case has become moot. But there is no assurance that former activities will not be resumed if the suit can be defeated. Under the circumstances, the case is one for preliminary injunction. See Sears, Roebuck & Co. v. Federal Trade Commission, 258 F. 307, 6 A.L.R. 358 (C.C.A.7); Guarantee Veterinary Co. v. Federal Trade Commission (C.C.A.) 285 F. 853; Federal Trade Commission v. Wallace, 75 F.(2d) 733 (C.C.A.8).

The Commission will accordingly have a preliminary injunction restraining the de-

fendants from violation of section 17 (a) (2) of the 1933 act, 15 U.S.C.A. § 77q (a) (2), and of section 9 (a) (2) of the 1934 act, 15 U.S.C.A. § 78i (a) (2), during the pendency of the suit.