**SECURITIES AND EXCHANGE COMMISSION, Appellant,**

v.

**CAPITAL GAINS RESEARCH BUREAU, INC., and Harry F. Schwarzmann, Appellees.**

No. 30, Docket 26942.

United States Court of Appeals Second Circuit.

Rehearing in Banc Feb. 22, 1962.

Decided July 13, 1962.

David Ferber, Associate Gen. Counsel, Securities and Exchange Commission, Washington, D. C. (Peter A. Dammann, Gen. Counsel, Ellwood L. Englander, Sp. Counsel, Walter P. North, Asst. Gen. Counsel, Ned B. Stiles, John Frohling and Allan F. Conwill, of counsel, Securities and Exchange Commission, Washington, D. C., on the brief), for appellant.

Leo C. Fennelly, New York City (Fennelly, Douglas, Eagan, Nager & Voorhees, New York City, on the brief), for appellees.

Before LUMBARD, Chief Judge, and CLARK, WATERMAN, MOORE, FRIENDLY, SMITH, KAUFMAN, HAYS and MARSHALL, Circuit Judges.

MOORE, Circuit Judge.

Plaintiff (appellant), Securities and Exchange Commission (SEC) in its complaint, alleging violation of Section 206(1) and (2) of the Investment Advisers Act of 1940, 15 U.S.C.A. 80b–6(1) and (2), sought a temporary restraining order, preliminary injunction and final injunction against defendants (appellees), Capital Gains Research Bureau, Inc., and Harry P. Schwarzmann, to prevent them from employing "any device, scheme, or artifice to defraud any client or prospective client" and from engaging "in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." By order to show cause based upon the complaint and an affidavit of an SEC investigator, a temporary restraining order was granted and a hearing upon an application for a preliminary injunction was directed. No additional proof was offered by the SEC upon the hearing; Schwarzmann, as owner of Capital Gains and as a defendant, submitted an affidavit opposing the application. The District Court upon this proof denied the motion for a preliminary injunction and vacated the stay. 191 F.Supp. 897 (1961). The SEC appealed. A panel of this court affirmed the district court's order. 2 Cir., 300 F.2d 745. A

petition of the SEC for a rehearing *in banc* was granted.

The only question presented at this stage of the proceedings, namely, an application for a preliminary injunction in advance of a trial upon the merits, is whether a violation of section 206(1) and (2) has been so clearly established that defendants are, in effect, to be found at fault without awaiting the development of all the facts upon a trial.

The SEC brings this proceeding under subsections (1) and (2) of Section 206. These subsections make it unlawful "(1) to employ any device, scheme, or artifice to defraud any client or prospective client" or "(2) to engage in any * * * business which operates as a fraud or deceit upon any client or prospective client."

Capital Gains publishes an investment advisory service. It distributes two bulletins, one entitled "Facts on the Funds" (not involved in this proceeding), which informs subscribers as to changes in the portfolios of Mutual Funds and another headed "Special Recommendation" or "Special Bulletin" which gives financial facts and figures concerning the specific company made the subject of the analysis. Only certain bulletins involving the special situations are before the court.

The SEC did not present in support of its application for a preliminary injunction any of the reports upon which it relied as showing a failure to disclose material facts. However, this deficiency was remedied by defendants who attached the special bulletins to their answering affidavit. In substance, the bulletins contain figures showing the corporate earnings over a period of years of the companies therein analyzed, an outline of the nature and current status of the business, future prospects, earnings and price-to earnings ratios, (in some cases) the number of Funds which own the stock, and usually a brief résumé of assets and profits.

All seven companies [1] analyzed are substantial companies in their respective fields and their stocks have been listed and traded on the New York Stock Exchange for many years. No charge is made by the SEC that any misstatements or false figures were contained in any of the bulletins; that the investment advice was unsound; that defendants were being bribed or paid to tout a stock contrary to their own beliefs; or that these bulletins were a scheme to get rid of worthless stock. The SEC premises its entire case upon the fact that shortly before the bulletins were mailed, defendants purchased shares of the stock and, in one instance where they suggested that the stock was too high, sold short. The SEC then points to the facts that there were small market rises in each of the stocks following publication and that defendants sold the stocks previously purchased (or covered as to the short sale) by them within a week or two thereafter.

The SEC correctly argues that federal securities laws are to be construed broadly to effectuate their remedial purpose. Nor can there be any serious dispute that a relationship of trust and confidence should exist between the advisor and the advised. A good example of a violation of this principle is found in SEC v. Torr: [2]

> "When a person gives advice to buy a stock under circumstances that lead the listener or reader to believe that the advice is disinterested, and suppresses the fact that for giving such advice he is in reality being paid by one anxious to sell the stock, the purchaser acting on the advice is imposed upon and deceived."

Or if it were established that Capital Gains made its recommendations for the purpose of endeavoring artificially to

---

1. Continental Insurance, Creole Petroleum, Union Pacific, Hart, Schaffner & Marx, United Fruit, Shattuck and Chock Full O'Nuts.

2. 15 F.Supp. 315, 317 (S.D.N.Y.1936), rev'd on other grounds (2 Cir. 1937), 87 F.2d 446.

raise the market so that it might unload its holdings at a profit, such conduct might well find itself within the prohibitions of Section 206(1) and (2).

But here the SEC's proof tends only to show that, at most, defendant Schwarzmann profited personnally from the predictable market effect of his honest advice. There is no proof that defendants employed "any device, scheme, or artifice to defraud any client or prospective client" or engaged "in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." The SEC's case, both here and in the court below, has been based entirely upon section 206, subsections (1) and (2) of the Act. And in interpreting these sections we must take account of the recent warning of the Supreme Court against excessive judicial expansion of provisions of the securities laws to accomplish objectives believed to be salutary. Blau v. Lehman, 368 U.S. 403, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962).

Although there is no direct occasion to consider whether defendants' activities were "manipulative" under the prohibition added to the Act by the Act of September 15, 1960, 74 Stat. 885, 15 U.S.C.A. § 80b–6(4), or could be prohibited by an SEC rule under that section, the amendment is not without significance. To section 80b–6 containing subsections (1) and (2) were added (3) (not here relevant) and (4) which made it unlawful for any investment adviser "to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative."

By the enactment of subparagraph (4), section 80b–6, the SEC now has been directed by Congress "by rules and regulations [to] define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative." The SEC has not shown itself reluctant to consider and draft "rules and regulations" toward this end. Already it has issued regulations dealing with registration of stock dealings by

investment advisers and their staffs and with types of advertising deemed to be fraudulent or deceptive. (See SEC Releases Nos. 120, 121, October 16, 1961, November 2, 1961.) The extent, if any, to which the SEC may believe it desirable to go in regulating purchasers or sales of securities by investment advisory publishers at or about the time of comment in their publications concerning such securities has been entrusted by Congress to the SEC. However, here the SEC's case is predicated solely on the deliberately meagre provisions of § 206(1) and (2) as enacted in 1940, 54 Stat. 853, and not on § 206(4) added by the Act of September 15, 1960, 74 Stat. 885. Whether conduct such as defendant's is now forbidden as a "manipulative" practice under the first clause of (4) or only if prohibited by detailed rules and regulations promulgated by the Commission, is an issue neither presented nor determined.

The legislative history of the Investment Advisers Act strongly supports our interpretation of the language of subsections (1) and (2). The Investment Advisers Act of 1940 was not as comprehensive as the Securities Act of 1933 or the Securities Exchange Act of 1934. It did not have to deal with the purchase and sale of securities and broker-dealer-customer relationships. Rather the Act was thought to be a modest beginning—not a great and final piece of legislation. "It followed a brief supplemental report on investment advisers which the Commission had filed as an incident of its investment trust study." Loss, "Securities Regulations," Vol. II, pp. 1392–1393. The report did not even propose legislation in any formal way, let alone define its scope. It merely described the investment counselling business in the United States and set forth state legislation on the subject, as well as showing how the Investment Counsellors of America regulated themselves internally. A representative of the SEC, testifying before the Senate committee in 1940, said the SEC knew very little about the investment-advising business and, therefore,

the "fundamental approach" of the proposed legislation was to get a "compulsory census" of the industry. "Aside from that fundamental approach the only other provisions in that title are just a few broad generalizations which say that you cannot embezzle your client's funds or you cannot be guilty of fraud." Hearings before a Subcommittee of the Senate Committee on Banking and Currency on S. 3580, pt. 1, 76th Cong., 2d Sess. (1940), p. 48. Hence, as Loss also tells us, "For twenty years this statute was little more than a continuing census of the Nation's investment advisers" until it "was substantially tightened up by a series of amendments in 1960, fifteen years after the Commission had first urged such action in a special report to Congress."

The history of the 1960 amendment confirms the narrow scope of the initial enactment, in an area highly relevant here. This history begins with a report by the Senate Subcommittee on Legislative Oversight in which there was a short section on the Investment Advisers Act. This section says (p. 53 of the report):

> "Our recommendation that the act be amended arises from the fact that as shown in the hearings held September 17, 1958 (transcript, pp. 3753–3767), investment advisers are not now required to disclose the financial interest of affiliates in securities concerning which they give advice."

This conclusion had arisen from hearings on the Crowell-Collier issue of convertible debentures. An affiliate of the issuer was an investment adviser, and had recommended the issue without disclosing its interest. The Subcommittee commented (p. 54):

> "The failure to disclose to Investment Survey subscribers an obvious 'dual interest' with respect to Crowell securities did not constitute a specific violation of the act; see testimony by SEC personnel, transcript pages 3755, 3756."

The Subcommittee called for amendment of the act to make sure that such behavior would be a violation, quoting a statement of SEC Chairman, Edward N. Gadsby, that it was now time to strengthen the act to make it more than "a mere census taking." See Independent Regulatory Commissions, Report of the Special Subcommittee on Legislative Oversight of the Senate Committee on Interstate and Foreign Commerce, H.R. Rep. No. 2711, 85th Cong., 2d Sess. (1959), pp. 53–54.

The SEC staff prepared a memorandum describing the reasons for the various amendments that were being proposed in 1959. The section relating to the new subsection (4) for § 206, Hearings Before a Subcommittee of the Senate Committee on Banking and Currency on S. 1176, etc., 86th Cong., 1st Sess. (1959), pp. 516–517, reads in part as follows:

> "Section 9. Creation of rulemaking power over antifraud provisions:
>
> "The substantive prohibitions of Investment Advisers Act are very limited. They are in essence contained in sections 205 and 206, which outlaw certain types of unfair investment advisory contracts, and prohibit an investment adviser from perpetrating fraud or from selling securities directly to clients without disclosing the capacity in which he is acting and obtaining the client's consent.
>
> "Because of the general language of the statutory antifraud provision and the absence of any express rulemaking power in connection with them, the SEC has always had doubt as to the scope of the fraudulent and deceptive activities that are prohibited and as to how far it is limited in this area by common law concepts of fraud and deceit. These include proof of a (1) false representation of; (2) a material; (3) fact; (4) the defendant must make it to induce reliance; (5) the plaintiff must rely on the false representation; (6) and suffer damage as a consequence.

"In order to overcome this difficulty, section 9 of the bill would amend section 206 to add a prohibition against engaging in conduct which is fraudulent, deceptive or manipulative and to authorize the Commission by rules and regulations to define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive or manipulative. This is about the identical wording of section 15(c)(2) of the Securities Exchange Act in regard to brokers and dealers.

"In the SEC's estimation, such a provision would enable it to deal adequately with such problems as a material adverse interest in securities which the adviser is recommending to his clients."

The committee reports show that Congress shared that assumption. The House Report, 86th Cong., 2d Sess. No. 2179, says the following:

"Section 9. Addition of rulemaking power to implement antifraud provisions:

"Present law.—Present section 206 contains general prohibitions against fraudulent activities.

"Problem.—Because of the general language of section 206 and the absence of express rulemaking power in that section, there has always been a question as to the scope of the fraudulent and deceptive activities which are prohibited and the extent to which the Commission is limited in this area by common law concepts of fraud and deceit.

"Remedy in the bill.—It is proposed that a new paragraph (4) be added to section 206 which would empower the Commission, by rules and regulations to define, and prescribe means reasonably designed to prevent, acts, practices, and courses of businesses which are fraudulent, deceptive, or manipulative. This is comparable to section 15(c)(2) of the Securities Exchange Act of 1934

which applies to brokers and dealers."

The Senate Report, No. 1760, U.S. Code Congressional and Administrative News 3502, accepts verbatim the SEC's reasons above quoted (p. 3509) and says generally that, "of the five acts administered by the Securities and Exchange Commission * * * the Investment Advisers Act of 1940 is the most inadequate," p. 3503. Coming to Section 9, it says this would authorize the Commission to issue regulations which would prohibit fraudulent, deceptive, and manipulative conduct," thereby affording a necessary supplement to the "very limited" provisions of §§ 205 and 206 which "outlaw certain types of unfair investment advisory contracts, and prohibit an investment adviser from perpetrating fraud or from selling securities directly to clients without disclosing the capacity in which he is acting and obtaining the client's consent" (p. 3509). Finally, the report says, "This provision would enable the Commission to deal adequately with such problems as a material adverse interest in securities which the adviser is recommending to his clients" (p. 3510).

No proof having been presented under sections 206(1) and (2) sufficient to justify the granting of a preliminary injunction, the order appealed from is affirmed.

CLARK, Circuit Judge, whom SMITH, KAUFMAN and MARSHALL, Circuit Judges, join (dissenting).

Decision in the present case turns on the meaning and scope of the Investment Advisers Act of 1940, last of the six great regulatory statutes of the era 1933–1940 controlling the marketing of investment securities. We need to recall the dramatic origin of these statutes as an outcome of the greatest stock market crash in history and the exhaustive studies then made of the evils of stock market manipulation and fraudulent stock selling. It seems universally conceded— and the favorable judicial attitude records the fact—that this legislation was

brilliantly successful in responding to a genuine social need. It is a prime demonstration of the capacity of a democratic government to meet a social crisis skillfully and positively. While it may not have solved every problem, it went a long way in facing the issues involved and protecting the investor from being victimized.

After this history of successful achievement it comes as a real shock to find a majority of this court ready to scuttle the last of these highly useful statutes and leave it as but a shell. In a summary opinion which ignores this history and the interconnection of these statutes, they officially declare this Act to be quite ineffective, thus terminating all present regulation of investment advisers and also casting doubt upon the other important acts framed in the same language. True, they pay verbal obeisance to the principle that these regulatory laws are to be construed broadly to effectuate their remedial purpose; in actual fact they cut down the operation of the Act's central provision, § 206, 15 U.S.C. § 80b–6, in the very area where its over-all purpose might be furthered. Beyond this the majority show an antagonistic attitude toward securities regulation which bodes ill for the future effectiveness of even the earlier statutes, heretofore generously supported. I believe it fairly demonstrable that so destructive a decision not merely is not compelled, but actually is quite contrary to sound legal principles of statutory interpretation as we have up to now known them.

Initially I find it necessary to set out in greater detail than do the majority the substantially undisputed facts upon which the SEC premised its complaint and motion for a preliminary injunction. Capital Gains Research Bureau, Inc., a leading registered investment advisory service, published two bulletins which it distributes to subscribers. One, entitled "Facts on Funds," explores changes effected in the portfolio of Mutual Funds; the other, "A Capital Gains Report," is a regular service which peri-

odically evaluates securities. The Capital Gains Report is denominated: "An Investment Service devoted exclusively to (1) The protection of investment capital, (2) The realization of a steady and attractive income therefrom, (3) The accumulation of CAPITAL GAINS thru the timely purchase of corporate equities that are proved to be undervalued." There are about 20,000 subscribers to the "Facts on Funds" bulletin, and about 5,000 subscribers to the "Capital Gains Report"; the latter publication is frequently distributed to a large group of about 100,000 nonsubscribers by use of general mailing lists.

During the period covered in the complaint Capital Gains analyzed several securities and made recommendations to its subscribers concerning them. At the same time, without disclosing the transactions to its customers, it traded in these securities to its profit. The Commission contends that this pattern of secret trading violated the antifraud provisions of the Investment Advisers Act of 1940, § 206(1) and (2), 15 U.S.C. § 80b–6(1, 2). The transactions were as follows:

(1) On March 15, 1960, Capital Gains purchased 500 shares of Continental Insurance Co. stock at price of $47¾ and $47⅞ per share. Three days later it circulated a report recommending purchase of the stock "for gradual but substantial appreciation." For two days after the mailing of the report the volume of trading increased substantially and the market price rose, and on March 29 Capital Gains sold the stock at $50⅛.

(2) Between May 13 and May 20, 1960, Capital Gains purchased 5,300 shares of United Fruit Co. stock, at a total cost of $117,114.00. On May 27, a report was circulated recommending United Fruit for both long- and short-term gains. Again immediately following the mailing date of the report, trading volume rose markedly and the price increased. (The average daily volume for 11 days preceding the issuance of the report was 5,955 shares; for the 4 days following, average volume was

over twice this—13,150.) Between June 6 and June 10, Capital Gains sold the 5,300 shares at a profit of $10,725.00.

(3) On July 5 and July 14, Capital Gains bought 2,000 shares of Creole Petroleum. Then, on July 15, the company issued an optimistic report on Creole. Again volume increased immediately after the report, and again the price rose. Between July 20 and 22, Capital Gains unloaded its shares at a profit.

(4) On August 6, 1960, Capital Gains purchased 600 shares of Hart, Schaffner & Marx stock at $23. On August 12, it issued a report recommending purchase of this security. Again volume increased substantially following the issuance of the report, and the price rose. Within 10 days Capital Gains sold 600 shares at a profit.

(5) Between October 4 and October 13, Capital Gains entered into several transactions involving the stock of the Chock Full O'Nuts Corp. It sold 500 shares short at a net price of $34,200.00. It also purchased 11—3 month "puts." Like the short sale, the purchase of a put reflected a bet by Capital Gains that the price of the stock would decline in the period. On October 14, it sent to its subscribers and others a report comparing the value of Chock Full O'Nuts to that of Frank G. Shattuck Co. (Schrafft's). The report suggested that Chock Full O'Nuts was overvalued. Again, the day after the report was mailed volume increased and the price, which had been rising, fell and went into a decline; on October 24, Capital Gains covered its short sale at a profit.

(6) Finally, on October 28 and October 31, 1960, Capital Gains purchased a total of 2,000 shares of Union Pacific stock at a price slightly above $25 per share. On November 1, a report was issued recommending this stock. Once again, immediately following the mailing of the report, the volume increased markedly, and the price rose. On November 7, Capital Gains sold the 2,000 shares at 27.[1]

Thus we have evidence of a practice known on Wall Street as "scalping," by which an investment adviser makes a short-term profit on the direct or secondary market reaction to its advice. The question for decision is whether this pattern of undisclosed purchases or short sales of securities shortly before recommendation, invariably followed by a rise in market volume and an appreciable rise or fall in price, followed shortly by sale or cover at a profit, constitutes sufficient evidence to warrant a finding of violation of the antifraud provisions of the Act. It is to prevent this practice that the SEC seeks the mild prophylactic of an injunction, without other penalties or sanctions.

Here there is no substantial dispute over the facts, and the injunction was denied solely because the district court believed that on these facts no violation of the Investment Advisers Act was made out. This was based on a seriously limiting interpretation of the antifraud provisions of the Act. Thus, as we have often ruled, we must grant full review of this legal determination at this time. See, e. g., Ring v. Spina, 2 Cir., 148 F.2d 647, 650, 160 A.L.R. 371; Carroll v. American Federation of Musicians, 2 Cir., 295 F.2d 484, 488–489; Societe Comptoir De l'Industrie Cotonniere v. Alexander's Department Stores, Inc., 2 Cir., 299 F.2d 33; Empresa Hondurena de Vapores, S. A. v. McLeod, 2 Cir., 300 F.2d 222. It is not a question of finding defendants at fault without

---

1. While the evidence submitted was based on affidavits, the material facts were not denied by an answering affidavit. Here a detailed statement of a prolonged course of conduct was set forth by the Commission; the injunction was sought in the public interest by an independent regulatory body; and the affidavits were clearly sufficient to support a preliminary injunction. Of course the majority really do not deny this, for they accept the facts as stated in their determination of the merits of this appeal. The suggestion that the defendants had to supply the deficiencies of proof seems an unnecessary and irrelevant slur on the activities of a busy and overworked agency.

awaiting full development of the facts. The uncontroverted facts before us require determination of the scope of the Act. And this is what the majority have done, for the denial of an injunction is grounded not on the state of the record, but on their view of the substantive scope of § 206.

As suggested above, it is necessary to view this legislation against its background, so totally ignored in the majority opinion. Faced with the great stock market crash and accompanying business depression, Congress reacted to the careful studies of stock manipulation before it by passing this series of six great regulatory acts for the protection of the securities investor. These were the Securities Act of 1933, the Securities Exchange Act of 1934, the Public Utility Holding Company Act of 1935, the Trust Indenture Act of 1939, the Investment Company Act of 1940, and the Investment Advisers Act of 1940. These statutes form an interrelated pattern of regulation of the securities industry, all of which are essential for the adequate protection of the investor.

One of the chief methods of regulation followed in the several acts was the requirement of full disclosure. In contrast to the common law, which was premised on the ancient maxim *caveat emptor,* the regulatory legislation adopted the philosophy of consumer protection, "let the seller also beware." H.R. Rep.No.85, 73d Cong., 1st Sess. 2 (1933), quoted in Wilko v. Swan, 346 U.S. 427, 430, 74 S.Ct. 182, 98 L.Ed. 168. Under this philosophy the seller of securities was required fully to disclose all relevant data, and a variety of devices was fashioned to achieve this end. For example, issuers must file detailed registration statements and circulate accurate prospectuses. Securities listed on an exchange must be registered and reports filed, and those soliciting proxies must disclose certain data. To stiffen and supplement these specific requirements, several antifraud provisions were enacted. Specific penalties and liabilities were provided for failure to disclose the required information. At the same time several general antifraud provisions were passed; among these were § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a); §§ 10(b) and 15(c) (1) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78o(c) (1); and the sections here under consideration.

These general antifraud sections, which in substantive scope contain many similarities, have been liberally construed to effectuate the broad remedial purpose of the acts. Section 17(a) has been held not to be limited to the narrow confines of common-law fraud. Charles Hughes & Co. v. S. E. C., 2 Cir., 139 F.2d 434, 435–436, certiorari denied 321 U.S. 786, 64 S.Ct. 781, 88 L.Ed. 1077; see Hughes v. S. E. C., 85 U.S.App.D.C. 56, 174 F.2d 969, 974; Norris & Hirshberg, Inc. v. S. E. C., 85 U.S.App.D.C. 268, 177 F.2d 228; Archer v. S. E. C., 8 Cir., 133 F.2d 795, certiorari denied 319 U.S. 767, 63 S.Ct. 1330, 87 L.Ed. 1717; S. E. C. v. Torr, D.C.S.D. N.Y., 15 F.Supp. 315, reversed on other grounds, 2 Cir., 87 F.2d 446, reaffirmed on remand D.C.S.D.N.Y., 22 F.Supp. 602; 3 Loss, Securities Regulation 1435 (2d Ed. 1961). The common-law doctrines of fraud and deceit grew up in a business climate very different from that involved in the sale of securities, and the rigors of those doctrines were ill fitted to regulation of the sale of this unique and intricate merchandise. See generally Shulman, Civil Liability and the Securities Act, 43 Yale L.J. 227 (1933).

The Investment Advisers Act of 1940, the final step in the regulation of the securities market, reflects the purposes and policies of its predecessors. Thus the Senate Committee on Banking and Currency concluded: "The nature of the functions of investment advisers, their increasing widespread activities, their potential influence on security markets and the dangerous potentialities of stock market tipsters imposing upon unsophisticated investors, convinces this committee that protection of investors requires the regulation of investment advisers on

a national scale." Sen.Rep.No.1775, 76th Cong., 3d Sess. 20 (1940).

The majority present an extensive analysis of the "legislative history" of the Act to support their narrow construction of § 206. Very little of this is actually history; and some of that is, as I shall point out later, a misquotation of statements by Professor Loss. The remainder of the extensive discussion is not of history, but of subsequent statements by the SEC and Congress twenty years after the passage of the Investment Advisers Act. Not only are these citations misleading, but reliance on them violates canons of construction laid down by the Supreme Court.

The 1959 statements by the SEC do not support the majority's interpretation of the statute.[2] They do reflect some confusion and concern over the precise scope of § 206, but they never adopt the restrictive interpretation suggested. And it would be naive not to recognize that these statements were made at the close and under pressure of an era of limited initiative and retreat by the regulatory agencies.[3] Even if the SEC had by rule or regulation explicitly adopted a narrow construction of § 206, it would seem highly doubtful that it could thereby defeat the intention of the prior Congress. See Greene v. Dietz, 2 Cir., 247 F.2d 689. *A fortiori,* expression of some hesitation or doubt in a later memorandum could hardly have such an effect. Cf. Wong Yang Sung v. McGrath, 339 U.S. 33, 47–48, 70 S.Ct. 445, 94 L.Ed. 616.

Similarly, the opinions attributed to a Congress twenty years after the event cannot be considered evidence of the in-

tent of the Congress of 1940. There is nothing in the extensive citations of the majority which indicates that the later Congress accepted a narrow interpretation of § 206. The reports merely echo SEC "doubts." Section 206(4), the 1960 amendment, utilizes language remarkably similar to that of the original statute; the chief material difference is the addition of rule-making power, and it may well be that Congress either rejected the doubts or held no views on the scope of the prior legislation. And even if Congress in 1960 had explicitly commented on the scope of the prior Act, its interpretation would be of little, if any, weight in determination of the meaning of the prior cognate legislation. Rainwater v. United States, 356 U.S. 590, 593, 78 S.Ct. 946, 2 L.Ed.2d 996. Thus the data marshaled by the majority prove no more than that a regulatory commission, perhaps sensing a favorable legislative climate, took an opportunity to secure fuller enforcement powers in order to simplify regulation. To determine the intention of the Congress of 1940 we must look backwards from the date of passage, not forwards.

The 1940 Act was designed to protect "the public" "from the frauds and misrepresentations of unscrupulous tipsters and touts" and to safeguard bona fide investment counsel "against the stigma of the activities of these individuals." Sen. Rep.No.1775, 76th Cong., 3d Sess. 21 (1940). It required registration and prohibited investment advisers from engaging in certain conduct, including that defined in §§ 205 and 206. If, as the majority imply, the statute did not achieve its regulatory purpose, but remained "lit-

---

2. Indeed, in 1955, the Commission argued that § 206, "enacted for the specific protection of the investing public," was definitely "not limited to the restrictive concepts of common law fraud." Seipel v. S. E. C., 97 U.S.App.D.C. 184, 229 F.2d 758, Brief for Appellee, p. 12. This argument was successful; the D.C.Circuit held that § 206 proscribed activity which would not have been actionable at common law. See 3 Loss, Securities Regulation 1516 (2d Ed. 1961).

3. See, e. g., Rosenblum v. F. T. C., 2 Cir., 214 F.2d 338; Blau v. Mission Corp., 2 Cir., 212 F.2d 77, 81, certiorari denied Mission Corp. v. Blau, 347 U.S. 1016, 74 S.Ct. 872, 98 L.Ed. 1138; Roberts v. Eaton, 2 Cir., 212 F.2d 82, 84, certiorari denied 348 U.S. 827, 75 S.Ct. 44, 99 L. Ed. 652; Greene v. Dietz, 2 Cir., 247 F.2d 689, 696.

tle more than a census," in Professor Loss's words, this was not due to any deficiency in the antifraud provisions here under consideration, which Loss concludes are very broad-reaching, 3 Loss, Securities Regulation 1515 (2d Ed. 1961), but because until 1960 the Commission had inadequate power to inspect the books and records of advisers or to require reports, 2 Loss, Securities Regulation 1408 (2d Ed. 1961). As Professor Loss points out, "a statute of this sort without an inspection power is a statute without teeth." Ibid.

The antifraud sections of this statute are substantially similar to, or identical with, § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), and, absent counterindications, should be construed *in pari materia.* Certainly with the earlier Acts before it, Congress would intend identical language to have identical import. Both outlaw use of a "device, scheme, or artifice to defraud" and acts which operate as a "fraud or deceit." Compare clauses (1) and (3) of § 17(a) of the earlier Act with clauses (1) and (2) of § 206 of the later Act. The sole substantial difference between the statute under review and its predecessor is that clause (2) of § 17(a) is not included in the later enactment. Even without explicit statement in the legislative history as to why this clause was omitted, the reasons seem obvious. This clause in essence restates common-law deceit as it was defined in the most liberal jurisdictions, prohibiting obtaining money or property by misleading statements or omissions. See 3 Loss, Securities Regulation 1433–1435 (2d Ed. 1961). It was both necessary and natural to include such a provision in statutes regulating the activities of "dealers" and "brokers." It is irrelevant, however, in the context of regulation of investment "advisers," who by definition do not buy and sell se-

curities for their customers, Investment Advisers Act of 1940, § 202(a) (11), 15 U.S.C. § 80b–2(a) (11), and thus are not normally in a position to obtain money directly by wrongful means. This change not reflecting any material alteration otherwise in the scope of the statute, Investment Advisers Act of 1940, § 206(1) and (2), 15 U.S.C. § 80b–6(1, 2), should be given the same broad construction, *mutatis mutandis,* as its predecessor. 3 Loss, Securities Regulation 1515 (2d Ed. 1961).[4] And of course it is the recognition that if investment advisers are to "defraud" anyone it will not be in the normal buyer-seller context which is crucial to this case. For it is in the secondary effects of advice, not in direct dealings, that the real potentials for fraud lie in this field. To reach and prevent that is the purpose of this legislation; defrauding in direct dealings is covered by the earlier Acts regulating brokers and dealers.

The majority, verbally emphasizing that the Act should be construed to achieve its remedial ends, recognize that manipulation, if intentional, would come within the scope of the Act. Certainly such activity—whatever it may be held to mean—would not be covered if the statute were narrowly limited. Compare Securities Exchange Act of 1934, § 10 (b), 15 U.S.C. § 78j(b). Having recognized that purposeful manipulation would violate the Act, the opinion then states that there has been insufficient proof here of such activity to warrant granting an injunction. It is utterly unclear to me what further proof is needed. For what could be clearer from the facts as set forth by the SEC than that Capital Gains knew that its recommendations would affect the market and timed their issuance so it would profit therefrom? Cf. S. E. C. v. Torr, supra, D.C.S.D.N.Y., 22 F.Supp. 602, 608. "In-

4. It seems a curious inversion of all principles of statutory construction to hold that the omission here of this unnecessary provision is proof of a legislative intent to limit the new Act strictly to the omitted prohibition. This topsy-turvy argument was made and rejected in Scipel v. S. E.

C., 97 U.S.App.D.C. 184, 229 F.2d 758. See 3 Loss, Securities Regulation 1516 (2d Ed. 1961). Seipel held that the S. E. C. need not show all elements of common-law fraud to prove a violation of § 206 of the Investment Advisers Act.

tent," if it need be found, can certainly be inferred from the facts as stated.

The majority's construction, however, is much narrower, for the gist of the opinion is that even intentional, secret manipulation is lawful if it is not "artificial." Thus it seems that an adviser can escape liability for scalping unless the SEC affirmatively proves he disbelieved his own recommendations. Since there are many creditable stocks upon which a plausible analysis can be built, such a burden will be almost impossible for the Commission to meet.

Not only is this construction inconsistent with the Congressional intent to regulate the· effect of advisers on the markets and on unsuspecting customers and with the settled trend of interpretation of parallel antifraud provisions; it also conflicts with the holding of one of the chief cases on which the majority itself relies, S. E. C. v. Torr, D.C.S.D. N.Y., 15 F.Supp. 315, 317, reversed on other ·grounds 2 Cir., 87 F.2d 446, reaffirmed on remand D.C.S.D.N.Y., 22 F. Supp. 602.[5]

Capital Gains violated its duty to disclose its secret trading. In a case brought prior to the passage of the 1940 statute the D.C. Circuit held that an investment adviser is in a fiduciary relationship with his clients and violates the antifraud sections of the 1933 and 1934 Acts by failing to reveal that he simultaneously exercised the role of broker-dealer, thus gaining a material interest in their response to his advice. Hughes v. S. E. C., supra, 85 U.S.App.D.C. 56, 174 F.2d 969. And in Charles Hughes & Co. v. S. E. C., supra, 2 Cir., 139 F.2d 434, 437, certiorari denied 321 U.S. 786, 64 S.Ct. 781, 88 L.Ed. 1077, we held that a registered broker-dealer which had secured the confidence of its customers in the reliability of its recommendations

committed statutory fraud by withholding the fact that the price charged its customers was above the prevailing market. "Once that confidence was established, the failure to reveal the markup pocketed by the firm was both an omission to state a material fact and a fraudulent device."

Here Capital Gains held itself out as an investment adviser and stated that the service was exclusively designed to help clients protect investment capital, realize income, and accumulate capital· gains. It thus naturally instilled in its clients the belief that it would render impartial and unbiased expert advice. Having taken this fiduciary stance, it then secretly engaged in profitable trading operations often inconsistent with its own advice. These operations were dependent for their success on client and general market reaction to the advice, and thus gave Capital Gains a motive to encourage purchases by its clients, regardless of the stock's intrinsic merit. Failure to disclose the existence of such a motive in the light of the implicit and explicit guaranty of impartiality was a scheme to defraud and operated as a fraud upon the clients.

Thus the majority's approving citation of S. E. C. v. Torr, supra, D.C.S.D.N.Y., 15 F.Supp. 315, is strange. For the finding of a statutory violation there is equally applicable in this case. In Torr, defendants were paid a bonus for all activity in a particular stock on the New York Curb Exchange which could be fairly attributed to the effects of their influence in touting the security. The court held that they committed statutory fraud when, in honestly recommending a perfectly good security, they suppressed the fact that they had such a direct financial interest in inducing clients to rely on their advice. The economic situation in this case is precisely the same.

---

5. In reversing the grant of a preliminary injunction, this court did not question the existence of a statutory violation, but held that, since the defendants had ceased engaging in the questioned practices and gave no indication of resuming them, the injunction was improvidently granted. On remand, Judge Woolsey reaffirmed the holding that the defendants' conduct violated § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a).

Some of my brothers seemingly draw some comfort in believing that the destructive effect of this construction of the statute will be limited in effect and duration because of powers now granted to the SEC by the 1960 amendment to the statute, § 206(4), 15 U.S.C. § 80b-6 (4). That amendment adds another prohibition which makes it unlawful for advisers to "engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative," and authorizes the SEC to issue rules and regulations defining and prescribing means to prevent such behavior. The thought seems to be that the SEC will hereafter outlaw the defendants' activities by regulation. This suggests an easy solution to a problem which is obviously bemusing the court. But like many an "easy" solution it becomes in reality the harder one because of the difficulties it creates. Among those difficulties are those of time, of power and validity of the indicated action, of legislative policy in the premises, and of potential paralysis of agency action and the execution of Congressional policies.

On the matter of time it is obvious that under the most favorable conditions —that even if it be eventually adjudicated that the SEC can declare activities criminal which the court now holds perfectly legal—it will be several years before any regulation hitting the defendants' practices can be properly drafted, enacted, and then upheld judicially. Obviously not in our generation can any effective regulation along this line be expected. As counsel pointed out in argument, the mere drafting is a matter requiring time and unusual skill, even before the product is submitted to pub-

lic scrutiny through official hearings and other means. In the two regulations it has adopted under this new statute the SEC has wisely limited itself to means and devices to effectuate what it accepts as the declared policy of the statute and is not making new policy. One of these, SEC Release No. 120, Oct. 16, 1961, requires registration of stock dealings by advisers *and their staffs,* thus giving it information as to the persons actually engaged in the investment counseling; while the other, SEC Release No. 121, Nov. 2, 1961, deals with *advertising* by investment advisers and is aimed to prevent advertising contrary to the statutory intent, i. e., fraudulent, deceptive, or manipulative. Neither of these would reach defendants' practices here; to do so would require a change in SEC policy, not merely to implement Congressional bans, but itself to initiate and define a ban and make it operative.

And that leads to the difficult problem of validity of such a prohibition. In Greene v. Dietz, supra, 2 Cir., 247 F.2d 689, we were troubled by the power of the SEC to make regulations not authorized by Congress or possibly contrary to the Congressional mandate. That question, which we did not try to resolve definitively, would arise in acute form here in view of the decision that scalping is a permitted and uncriticizable practice under present legislation. This, as I have indicated, means in substance that only common-law fraud, i. e., misrepresentation relied on to one's loss, is interdicted by the provisions of § 206 (1) and (2).[6] What is changed under the new amendment? Obviously the words "fraudulent" and "deceptive" add nothing more; the only addition is the

6. The panel opinion by Judge Moore, 2 Cir., 300 F.2d 745, has been adversely cited by commentators as indicating, *contra* to settled and uniform authority, that the antifraud provisions of the Securities Acts are limited to the narrow elements of common-law fraud. This is the position taken by Professor Loss in the 1962 Supplement to his treatise, 3 Loss, Securities Regulation 1435 n. 19 (1962 Supp.), and by Note, 75 Harv.L.

Rev. 1449, 1450 n. 6 (1962). See also Note, 71 Yale L.J. 1342, 1347 (1962). While the majority opinion here is more guarded as to rationale and more generous in disclaiming illiberality than its predecessor, the effect of the opinion is precisely the same. Moreover, no attempt is made to distinguish the language of § 206 from identical phrases in the other antifraud statutes and rules.

word "manipulative." But it is difficult to perceive how a court which does not regard scalping as fraudulent can conceive of it as manipulative; it must believe that the practice amounts only to ordinary buying and selling in the natural course of business. There thus would be serious question as to the validity of a regulation prohibiting and making criminal practices not prohibited by Congress—a question needless to say which does not arise under what seems to me the more natural interpretation of the Congressional purpose which I urge.

The other two objections I shall discuss together more hurriedly. In both the original and the amended additional form of the statute, the prohibition (whatever its meaning) is made direct and unequivocal: "it *shall be unlawful* for any investment adviser" subject to the Act to engage in the fraudulent, deceptive, or manipulative act, practice, or course of business. The mandate is not made subject to the condition precedent of some validating action by the SEC; it cannot add to or subtract from the Congressional action. When Congress wished to provide such a condition precedent it knew how to do it. Thus in § 10(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(a), it made unlawful the use of means to effect a short sale "in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." And in subdivision (b) it enacted a like provision as to manipulative or deceptive devices or contrivances in connection with the purchase and sale of any securities. The addition by way of gloss here of such a condition precedent suggests a general rule (there being no special reason for limiting it to the present case) which would go well beyond this case in destructive possibilities. Now in general the regulatory agencies seek injunctions to effectuate legislative policy; [7] if first there must be some definite and precise agency regulation the execution of Congressional policy will be hampered and delayed, if not made impossible.

In short, the hope of a regulation which will require Capital Gains to meet appropriate fiduciary standards not contained in the statute is illusory indeed. I see no ameliorating factor to lessen the harshness of the decision, and am completely at a loss to understand the reason for it. As I have indicated, it is not a required result; actually the contrary would have been much simpler under the precedents, particularly because of the troublesome doubt now cast upon the meaning of the antifraud provisions of the Securities and Securities Exchange Acts. Perhaps its worst feature is that it sanctions and indeed endorses a low standard of business morality, as the business world has apparently been quick to see. [8] The form of scalping here engaged in is a shocking business, as well as the chief method by which an investment adviser may bilk his clients. This

---

7. All of the six securities acts contain provisions authorizing injunctive relief without conditions, such as are here being formulated. See, e. g., Securities Act of 1933, § 20, 15 U.S.C. § 77t; Securities Exchange Act of 1934, § 27, 15 U.S.C. § 78aa; Investment Advisers Act of 1940, § 209, 15 U.S.C. § 80b-9. Many, perhaps most, other statutes administered by government agencies authorize injunctive relief. See, e. g., Agricultural Adjustment Act, § 8a(6), 7 U.S.C. § 608a(6) ; Civil Aeronautics Act of 1938, § 1007, 49 U.S.C. § 647 ; Communications Act of 1934, § 401, 47 U.S.C. § 401; Federal Trade Commission Act, § 13, 15 U.S.C. § 53; Interstate Commerce Act, § 16(12), 49 U.S.C. § 16(12) ; Labor Management Relations Act of 1947, § 101(*l*), 29 U.S.C. § 160(*l*). Arguments against a required rule-making in this connection are stated in 75 Harv.L.Rev. 1449, 1451 (1962), discussing Cady, Roberts & Co., SEC Release No. 6668, Nov. 8, 1961.

8. See the syndicated columns of the financial writer Sylvia Porter in the New York Post for Jan. 4, 1962, "Stock 'Scalping' Upheld by Court"; Jan. 5, 1962, "Investment and Ethics"; and Feb. 16, 1962, "Stock 'Scalping' Faces Court Test." Cf. Leslie Gould, Financial Editor, "SEC Puts Postscript on 'You Only Have to Get Rich Once' Book," N.Y.Journal-American, May 24, 1962, p. 29.

regulatory statute was explicitly aimed to protect the loyal investment adviser against the tipsters and touts and the less desirable members of the profession generally. In all probability it will be those devoted fiduciaries who will be hardest hit by this decision which levels all to one low standard. By holding scalping not a violation of § 206(1) and (2), the majority not only have sadly emasculated a promising statute, but have also cast doubt generally upon all governmental regulation in the general public interest.

I therefore reiterate the position I took in dissenting initially from the decision of the panel majority, 2 Cir., 300 F.2d 751–754. I believe the decision below should be reversed, and an injunction *pendente lite* granted.